# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 06-21183-CIV-TORRES

## CONSENT CASE

MARISOL RUIZDELATORRE and
MICHELLE FRAGOSO-DIAZ

      Plaintiffs,

v.

CITY OF MIAMI BEACH, a Florida municipal
corporation; Officer ANTONIO FERBEYRE;
Officer NOEL CASTILLO

      Defendants.

_____/

## OMNIBUS ORDER ON RULE 50 AND 59
## MOTIONS WITH RESPECT TO PLAINTIFF RUIZDELATORRE

This matter is before the Court on five motions: (i) Defendants, Officer Noel

Castillo and Officer Antonio Ferbeyre's Motion for Judgment as a Matter of Law [D.E.

140]; (ii) Defendant City of Miami Beach's Motion for Judgment as a Matter of Law

[D.E. 145]; (iii) Defendants, Officer Noel Castillo and Officer Antonio Ferbeyre's Motion

for Remittitur [D.E. 147]; (iv) Defendant, City of Miami Beach's Motion for Remittitur

[D.E. 148]; and (v) Defendants City of Miami Beach, Officer Noel Castillo and Officer

Antonio Ferbeyre's Motion for New Trial [D.E. 149].  Plaintiff Marisol Ruizdelatorre

("Ruizdelatorre") responded to these motions;  Officer Noel Castillo ("Castillo"), Officer

Antonio Ferbeyre ("Ferbeyre") (collectively "Defendant Officers") and City of Miami

Beach ("CMB") replied.  Accordingly, these matters are ripe for disposition.

# I.  BACKGROUND

On July 19, 2004, musicians Ruizdelatorre and Michelle Fragoso-Diaz ("Fragoso-Diaz") performed at a nightclub on Miami Beach from approximately 11:00 p.m. until 3:00 a.m. the next morning.[1]  Following their performance, they stopped briefly at a sandwich shop.  Ruizdelatorre, who was under twenty-one years of age at the time, did not consume much, if any, alcohol that evening.  After the sandwich shop, at approximately 5 a.m., Ruizdelatorre, Fragoso-Diaz, and a fellow band-mate, Armando Gola, all went to Fragoso-Diaz's apartment, where he and Ruizdelatorre were living together.

Though they were tired, the three musicians did not want to leave their equipment in the car and thus needed to move the equipment up the apartment building stairs and into their apartment.  They made several trips up and down the stairs as they transferred their musical equipment from the car to the apartment.  Some of Fragoso-Diaz's neighbors, however, became upset about the early-morning raucous.  A verbal confrontation ensued between one elderly neighbor and Fragoso-Diaz about the noise that they were creating.  He tried to ignore her and finish the task.  Gola then left the apartment about fifteen minutes later.

In the meantime, the elderly neighbor, Daniela Atanasova, called the police several times complaining of noise and a domestic disturbance.  At about 6:00 a.m., Defendant Officers went to Fragoso-Diaz's apartment in response to a dispatch call

---

[1]     The trial testimony and court record provide the basis for the summary of facts that are material to the issues presented, stated in the light most favorable to Ruizdelatorre, the non-moving party.  We include primarily those facts relevant to Ruizdelatorre's claims.

requesting assistance for a 34D "domestic dispute."  Defendant Officers knocked on Fragoso-Diaz's apartment door and he opened the door.

From this point, the Defendant Officers' version of the events and that of Ruizdelatorre and her former boyfriend, Fragoso-Diaz, vary greatly.  Drawing all inferences in the record in Ruizdelatorre's favor, the facts show that Fragoso-Diaz opened the door.  The Defendant Officers immediately questioned why he was making so much noise and disturbing his neighbors.  The Officers moved into the apartment, without Fragoso-Diaz's express consent, where they could see the musical equipment, and at which point they questioned why they were having a party and blasting music. They instructed Fragoso-Diaz to sit down on the couch as they looked around the apartment.  Fragoso-Diaz told them that they were not having a party and that his girlfriend was in the shower.  Fragoso-Diaz said that he knew his rights and asked them to leave the apartment until Ruizdelatorre could get dressed.

At that point Ruizdelatorre came out of the bathroom in a scared manner and asked why Fragoso-Diaz had let them enter and asked the officers why they were there. The Defendant Officers then engaged Ruizdelatorre, who at that point was only wearing a bath towel.  At some point Ruizdelatorre told the officers she was going to call her father to let him know what was happening.  Officer Ferbeyre reacted by then turning to Fragoso-Diaz, saying "that's it," and proceeded to arrest him.  He grabbed his hands, lifted him from the couch, and handcuffed him.  He then began pushing Fragoso-Diaz out of the apartment.

The Defendant Officers then escorted Fragoso-Diaz out of his apartment, down the stairs, and towards their cruiser.  Wearing only the bath towel she had on when

she exited the shower, Ruizdelatorre then immediately followed the Defendant Officers as they escorted Fragoso-Diaz down the hall and down the stairs, all the while protesting his arrest.  When asked at trial why she did not put on clothes before she left the apartment, Ruizdelatorre stated that she "went into a state of frenzy almost – almost like if there's a fire going on in your house, you don't go put on your clothes." [D.E. 140 at 18].  Ruizdelatorre acknowledged following the officers:

Q.    Did you follow [Defendant Officers] as they went down the stairs?

A.    I did, I follow them.

Q.    Were you saying anything?

A.    I said to them, why are you guys doing this to my boyfriend? Why are you guys doing this? He did not do anything.

Q.    And where were you when they put him in the car?

A.    I was standing on the sidewalk because I was I following them, you know.

[...]

A.    I said, why are you guys doing this to us, we just came home from work. Let us explain what happened.  Why are you doing this?  But I wasn't yelling and I was just crying.  I'm just really sensitive about this.

[D.E. 140 at 17].

Fragoso-Diaz confirmed Ruizdelatorre's demeanor at the time of the incident:

Q.    And [Ruizdelatorre was] speaking very calmly to the officers?

A.    Calm there was no calm.  There was a lot of stress.  She was very unhappy, very sad, but she was not screaming at them.

[D.E. 140 at 18].[2]

_____

[2]    Defendant Officers point out that in Ruizdelatorre's deposition, she stated that she was actually scared of the officers, and that she protested Fragoso-Diaz's

Ruizdelatorre continued to follow the Defendant Officers as they escorted Fragoso-Diaz down the stairs, all the while protesting his arrest and asking why they were doing what they were doing. The lead officer was pushing Fragoso-Diaz down the stairs, grabbing his arms and hair, while Officer Castillo was commanding Ruizdelatorre to stay back. Ruizdelatorre did not stay back.

After reaching the street level, Defendant Officers walked Fragoso-Diaz towards their vehicle and placed him in the back of their police car. Ruizdelatorre was still protesting why the officers were arresting him. At that point she was only a few feet away, where she again exclaimed that Fragoso-Diaz had done nothing wrong and continued to ask the officers why they were arresting him. Defendant Officers then turned to Ruizdelatorre, and stated that they were placing her under arrest, as well. As the officers put her in handcuffs, her towel fell down, and her nude body was briefly exposed. Gola, who was standing nearby, immediately grabbed the towel and tried to cover her. Ruizdelatorre was placed in the police car, and Gola went back to the apartment and brought Ruizdelatorre clothing.

Gola's testimony generally supported Ruizdelatorre's account of the events that night. He testified that they had not been trying to create a disturbance when they arrived at the apartment, and tried not to get the elderly neighbor more upset than she was. He also testified that when he left the apartment and went downstairs, he was confronted by the officers who were acting belligerently. They demanded his

---

arrest in a "quiet timid type voice that I usually wouldn't have unless I was very intimidated." [D.E. 140 at 19]. Based in part on that representation of the facts, the Court denied her motion for summary judgment.

identification and told him to leave the scene.  When he saw them go up the stairs, he remained in the area, where he saw them emerge from the apartment building with Fragoso-Diaz handcuffed and Ruizdelatorre right behind.  Significantly, he also testified that she was yelling for them not to arrest Fragoso-Diaz.  They arrested her when she continued doing so as they placed Fragoso-Diaz up against their vehicle.

Ruizdelatorre was arrested for disorderly intoxication pursuant to Florida Statute § 856.011 and resisting an officer without violence / obstruction of justice pursuant to Florida Statute § 843.02.  Defendant Officers testified that there was probable cause to arrest Ruizdelatorre based on these two charges.  Not surprisingly, their testimony painted quite a different picture of the incident.  According to Defendants, Ruizdelatorre was cursing, screaming and yelling as Fragoso-Diaz was handcuffed and escorted to the police car.  Supposedly, as the officers were putting Fragoso-Diaz in the back of the police car, Ruizdelatorre tried to grab at Fragoso-Diaz's arms while begging the officers to let him go.  According to Defendant Officers, Ruizdelatorre interfered with Fragoso-Diaz's arrest, and they placed Ruizdelatorre under arrest for resisting without violence.  In addition, the officers testified that they could then smell alcohol on her breath, thus the charge of disorderly intoxication.  The jury heard supporting testimony from Defendant Officers, Ms. Atanasova (the individual that called the police), and Ms. Atanasova's daughter, a fellow resident of the apartment complex where the incident took place.  The Atanasovas corroborated Defendant Officers' claims that Ruizdelatorre was acting in a frantic manner at the time.

Again, the jury's verdict requires that we draw all conflicting inferences in Ruizdelatorre's favor.  Consequently, we must find that the jury accepted her and her witnesses' contention that she was not screaming or cursing at the officers, but instead was speaking to them in a frenzied fashion while under stress.  She was asking them why they were arresting her boyfriend and asking them not to.  We assume that she had not consumed alcoholic beverages that night and was not intoxicated.  We also cannot credit the officers' testimony that they arrested her only when she physically tried to grab Fragoso-Diaz and pull him away from them when they were trying to place him in the vehicle.  All the Plaintiffs' witnesses disputed that version of the events.

Significantly, however, we cannot discount the officers' testimony that they were commanding Ruizdelatorre to stay back while they were marching Fragoso-Diaz down the stairs following his arrest.  None of Plaintiffs' witnesses disputed that particular testimony, thus the only evidence in the record supports the finding, for Rule 50 purposes, that while she was following them down the stairs the officers, and specifically Officer Castillo, was instructing her to stay back from the officers.  She did not stay back and followed them down the stairs and to the sidewalk.

After she was arrested at that sidewalk, she was taken to the police station.  At the station she would later overhear officers referring to her and Fragoso-Diaz – he was in a neighboring jail cell – as "Lenny Kravitz and the naked girl" during the booking process.  She was released from jail a few hours later.

Ultimately, Ruizdelatorre proceeded to trial on three causes of action: (i) a § 1983 claim against Defendant Officers for unlawful arrest; (ii) a § 1983 claim against

Defendant Officers for excessive force; and (iii) a state law false arrest claim against CMB.[3]  On March 31, 2008, the Court held a five-day jury trial on damages.  The key witnesses in the Plaintiffs case-in-chief were Ruizdelatorre and Fragoso-Diaz, along with supporting testimony provided by Armando Gola.

Following Plaintiffs' case-in-chief, and again before the close of the evidence, Defendant Officers moved for judgment as a matter of law on Ruizdelatorre's § 1983 claims.  We granted the motion with respect to the claim for excessive force, as there was no evidence whatsoever to support this charge, and no reasonable jury could have found in favor of Ruizdelatorre.  We denied the motion for motion for judgment as a matter of law on her § 1983 claim for unlawful arrest.  We assumed at that point that Ruizdelatorre laid a sufficient evidentiary foundation in their case-in-chief to allow a reasonable jury to find in her favor on the unlawful arrest claim.  For this same reason, we denied CMB's motion for judgment as a matter of law on the state law claim for false arrest.

The jury found in favor of Ruizdelatorre on her federal claim of unlawful arrest against Defendant Officers and on her state law claim of false arrest against CMB.  *See* Verdict Form [D.E. 132].  Specifically, the jury awarded Ruizdelatorre $175,000 in damages.  Strictly in accordance with the jury's verdict, and subject to Rule 50(b)

---

[3]      Plaintiffs' § 1983 claim for false arrest against CMB was dismissed at the summary judgment stage [D.E. 90 at 30] because there is no respondeat superior liability in this case, absent additional facts not established in the record, to make a municipality liable for the wrongful actions of its police officers in making a false arrest.  Additionally, Plaintiffs' § 1983 claim against CMB for civil rights deprivations based on customs and practices was also dismissed on summary judgment, along with Plaintiff's state law sexual battery and invasion of privacy claim against CMB.

considerations, the Court entered judgment on April 15, 2008 in Ruizdelatorre's favor on Count I (false arrest against CMB) and Count V (unlawful arrest against Defendant Officers) of the Amended Complaint in the total amount of $175,000, plus post-judgment interest. [D.E. 133].   We also formally entered judgment against Ruizdelatorre on the remaining counts of the Amended Complaint pursuant to the Court's Court's pretrial summary judgment order [D.E. 90] and the ruling at trial granting Defendant Officers' Rule 50(a) motion on excessive force.  The Court reserved the issue of attorneys' fees for post-trial adjudication.

Following the entry of judgment, Defendant Officers filed a Rule 50(b) motion on the issue of qualified immunity and a Rule 59 motion for remittitur claiming an excessive damage award.  CMB filed a Rule 50(b) motion and a Rule 59 motion for remittitur, raising identical arguments.  Defendant Officers and CMB jointly filed a Rule 59 motion for a new trial based largely on the conduct of Plaintiffs' counsel during trial.  We first address the Rule 50 motions for judgment as a matter of law.

## II.    ANALYSIS - RULE 50(b)

### A.    <u>Standard of Review</u>

Fed. R. Civ. P. 50 is the mechanism for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the case:

> (a)(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)." *Chaney v. City of Orlando,* 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting 9A C. Wright and A. Miller, *Federal Prac. & Procedure* § 2537 (2d ed. 1995)); *see also Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1210 (11th Cir. 2006). Further, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based on the same grounds as the original request for judgment as a matter of law prior to the case being submitted to the jury." *Chaney,* 483 F.3d at 1227 (quoting *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004)).

Thus, under both Rule 50(a) and 50(b), a moving party must meet a heavy burden in order to prevail on a motion for judgment as a matter of law. The standard of review for a district court to grant the motion is whether, "when the facts and inferences are viewed in the light most favorable to the opposing party, they 'point so strongly and overwhelmingly in favor of one party the Court believes that reasonable men could not arrive at a contrary verdict.'" *United States v. Vahlco Corp.,* 720 F.2d 885, 889 (11th Cir. 1983) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969)). The court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." *Telecom Tech. Servs., Inc. v. Rolm Co.,* 388 F.3d 820, 830 (11th Cir. 2004); *see also Robbins v. Koger Props., Inc.,* 116 F. 3d 1441 (11th Cir. 1997) ("A mere scintilla of evidence is not sufficient to support a jury verdict.").

While the court must afford due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation. *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1245-46 (M.D. Fla. 2007).  Rule 50 allows the trial court to remove issues from the jury's consideration "when the facts are sufficiently clear that the law requires a particular result." *Id.* (citations omitted).  Accordingly, if Ruizdelatorre did not provide a legally sufficient evidentiary basis for a reasonable jury to find in her favor on her claims, we must grant Defendants' Rule 50(b) motions for judgment as a matter of law.  *See also Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1278 (11th Cir. 2005) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.2d 1189, 1192 (11th Cir. 2004)).

On the other hand, we must deny Defendants' motions for judgment as a matter of law if Ruizdelatorre presented "enough evidence to create a substantial conflict in the evidence on an essential element" of her claims.  *Pickett*, 420 F.3d at 1278 (citing *Bogle v. Orange County Board of County Comm'rs,* 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.")).  To that end, we note that it is not the function of the Court to make credibility or factual determinations under the guise of Rule 50 review.  *See, e.g., Jackson v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276, 1281 (11th Cir. 2005).  If there are conflicting inferences that can be drawn from that evidence, it is not the Court's role to pick the better one.  Instead, all reasonable inferences from the evidence must be drawn in Ruizdelatorre's

favor.  *Id.; see also Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1325 (11th Cir. 1982) (quoting *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 696, 82 S. Ct. 1404, 1409, 8 L. Ed. 2d 777 (1962) ("we are bound 'to give the [plaintiff] the benefit of all inferences which the evidence fairly supports even though contrary inferences might be reasonably drawn'")).

Similarly, if we disagree with the jury's assessment of damages, a federal court has no general authority to reduce the amount of a jury's verdict. *Kennon v. Gilmer*, 131 U.S. 22, 29, 9 S. Ct. 696, 33 L. Ed. 110 (1889).  The Seventh Amendment prohibits re-examination of a jury's determination of the *facts*, which includes its assessment of the extent of the plaintiff's injuries. *Id.* at 30 ("[A federal court may not] according to its own estimate of the amount of damages which the plaintiff ought to have recovered, . . . enter an absolute judgment for any other sum than that assessed by the jury."). To do so would deprive the parties of their Seventh Amendment right to a jury trial. *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1329 (11th Cir. 1999).[4]

If *legal* error is detected, however, the court has the obligation and the power to correct the error by vacating or reversing the jury's verdict. *Id.*  Where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount. *Johansen,* 170 F.3d at 1330 (citing *New York, L.E. & W.R. Co. v. Estill*, 147 U.S. 591, 13 S. Ct. 444, 454, 37 L. Ed. 292 (1883) (modifying a judgment when the jury

---

[4]     When a court finds that a jury's award of damages is excessive, however, it may grant the defendant a new trial or grant the plaintiff the option of a remittitur of damages.  *See* Fed. R. Civ. P. 59.  *See infra* at Section III.

improperly awarded interest)).  If a reduction in damages is necessitated by legal error, the reduction is not a remittitur and a new trial is not required. *Johansen*, 170 F.3d at 1330 (court may enter judgment reducing punitive damages award to comply with due process guidelines as a matter of law, without plaintiff's consent).

### B.    *Defendant Officers are Entitled to Qualified Immunity*

Defendant Officers claim entitlement to qualified immunity as to Ruizdelatorre's unlawful arrest claim under § 1983. [D.E. 140 at 3].  Qualified immunity protects law enforcement officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).  Qualified immunity addresses the concern that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.*  For this reason, qualified immunity is a privilege that provides "'an immunity from suit rather than a mere defense to liability.'"  *Saucier v. Katz,* 533 U.S. 194, 200-01, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985)).  Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

In making a qualified immunity determination, we are obliged to review the facts in the light most favorable to the plaintiff. *E.g., Skop v. City of Atlanta,* 485 F.3d 1130, 1136 (11th Cir. 2007) (citation omitted). An official asserting the affirmative defense of qualified immunity "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendant Officers were performing their discretionary functions as police officers at the time they arrested Ruizdelatorre. Thus, the burden shifts to Ruizdelatorre to show that qualified immunity is not appropriate. *Id.* (citing *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

Qualified immunity is a two-part inquiry. *Davis v. Williams*, 451 F.3d 759, 762 (11th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. at 201). First, "in a light most favorable to the part asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* Second, if a constitutional right would have been violated under the plaintiff's version of the facts, was that right clearly established? *Id.* (citing *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004) ("[We must determine] whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law")).

### 1. ***Ruizdelatorre's Constitutional Rights Were not Violated***

The first step in our qualified immunity analysis is to determine whether the record supports Ruizdelatorre's contention that Defendant Officers violated

Ruizdelatorre's constitutional rights in arresting her. Individuals have a Fourth Amendment right to be free from "unreasonable searches and seizures." An arrest is a seizure of the person, and the reasonableness of an arrest is determined by the presence or absence of probable cause for the arrest. *Skop*, 485 F.3d at 1137 (citations omitted). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search [and seizure] under the Fourth Amendment." *Durruthy v. Pastor,* 351 F.3d 1080, 1087 (11th Cir. 2003) (citing *Redd v. City of Enterprise,* 140 F.3d 1378, 1382 (11th Cir. 1998)). But "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L.Ed.2d 549 (2001).

In the context of a claim for false arrest, "arguable probable cause," *not* the higher standard of actual probable cause, governs the qualified immunity inquiry. *E.g., Knight v. Jacobson*, 300 F.3d 1272, 1274 (11th Cir. 2002). Arguable probable cause is where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" the plaintiff. *Williams,* 451 F.3d at 762 (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). This lesser standard recognizes that, while an officer who

arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity. "We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." *Skop,* 485 F.3d at 1137 (citing *Anderson,* 483 U.S. at 641 ("it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable."). To determine whether arguable probable exists, courts must thus look to the totality of all the circumstances. *Williams*, 451 F.3d at 763.

At trial, Defendant Officers testified that there were two possible crimes for which Ruizdelatorre could have been arrested: disorderly intoxication pursuant to Florida Statute § 856.011 and resisting an officer without violence pursuant to Florida Statute § 843.02. If Defendant Officers possessed probable cause or arguable probable cause to arrest Ruizdelatorre for either, they are entitled to qualified immunity. In Defendant Officers' post-trial motion, they also add, for the first time in this litigation, that there was arguable probable cause to arrest Ruizdelatorre for breach of the peace/disorderly conduct pursuant to Florida Statute § 877.03 [D.E. 140 at 21]. We will address each charge in turn.

### (a)  Disorderly Intoxication

Section 856.011 provides that:

> No person in the state shall be intoxicated and endanger the safety of another person or property, and no person in the state shall be intoxicated or drink any alcoholic beverage in a public place or in or upon any public conveyance and cause a public disturbance.

Defendant Officers testified that they smelled a strong odor of alcohol on Ruizdelatorre's breath at the point at which she was alleging trying to grab Fragoso-Diaz's arm.   They also suggest that even if the officers did not smell alcohol, Ruizdelatorre's conduct – "pursuing the police wearing only a towel, repeatedly questioning them as to the arrest of Fragoso-Diaz, acting in a matter that was anything but calm" – gave rise to arguable probable to arrest her for disorderly intoxication. [D.E. 140 at 20].

But, viewing the facts in a light most favorable to Ruizdelatorre, we readily conclude that Defendant Officers did not possess arguable probable cause to arrest Ruizdelatorre for disorderly intoxication.   Under Ruizdelatorre's version of the incident, the version that we must accept as true, she did not drink any alcoholic beverages the night she was arrested, and was not intoxicated.   The officers did not testify to any facts that would support an objective basis to find to the contrary, like any bloodshot eyes, slurred speech, staggered movements, or even any smell of alcohol at any earlier point in their encounter.

Moreover, it is well established in Florida that, under this statute, a person may only be charged with disorderly intoxication if the person is both intoxicated *and* at the same time endangering the public safety.   *See, e.g., State v. Holden,* 299 So. 2d 8 (Fla. 1974); *Jernigan v. State,* 566 So.2d 39 (Fla. 1st DCA 1990); *Blake v. State,* 433 So.2d 611 (Fla. 1st DCA 1983).   Florida law does not make public intoxication unlawful; only disorderly intoxication that endangers the public is unlawful under the statute.   *Dazell v. Chertoff,* 2005 WL 2581017, *3 n.6 (M.D. Fla. Oct. 13, 2005).

Thus, for instance, someone who is observed staggering and acting unsteadily on a public road is not committing the offense of disorderly intoxication, even if that person is clearly intoxicated. *See, e.g., Papalas v. State,* 645 So. 2d 153, 155 (Fla. 1st DCA 1994). Someone in a public place who smells of alcohol, who is flapping his arms around, talking loudly with profanity, and causing "a little disturbance" is still not engaging in disorderly intoxication. *See Blake,* 433 So. 2d at 612.

This record, from Ruizdelatorre's perspective, does not support a finding that Ruizdelatorre posed any physical danger to anyone or anything. No member of the public was in the immediate area and Ruizdelatorre was not doing anything other than protesting her boyfriend's arrest. And the *only* evidence of intoxication was the Defendant Officers' conclusory statement that the jury clearly rejected. The record, for Rule 50(b) purposes, would thus not allow the Court to upset the jury's verdict based on this argument.

### (b)  Resisting / Obstruction of Justice

A different result, however, follows when we turn to the more difficult obstruction charge under section 843.02. Even when we draw all inferences in Ruizdelatorre's favor as to any facts in dispute, we find that Defendant Officers did possess arguable probable cause to arrest Ruizdelatorre for resisting an officer without violence / obstruction of justice.

We begin this analysis with what Florida law defines to be probable cause for obstruction. The relevant statute provides:

> Whoever shall resist, obstruct, or oppose any officer . . . in the execution
> of legal process or in the lawful execution of any legal duty, without

offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree. . . .

Fla. Stat. § 843.02.  Probable cause for an arrest under section 843.02 requires a showing that:  "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the action by the defendant constituted obstruction or resistance of that lawful duty." *Williams*, 451 F.3d at 764 (quoting *Slydell v. State*, 792 So.2d 667, 671 (Fla. 4th DCA 2001)).

The first prong of the test under Florida law has not been disputed. Ruizdelatorre's version of the events that morning acknowledged that the officers were purportedly investigating a neighbor's complaint that led them to arrest Fragoso-Diaz. They were thus engaged in the execution of a legal duty.

Because this first prong is not in dispute, we need only focus on the second aspect of an obstruction of justice charge:  whether Ruizdelatorre "obstructed" or "resisted" Defendant Officers as they were executing their legal duty.  The record, drawing all reasonable inferences in Ruizdelatorre's favor, shows that after Fragoso-Diaz was being placed under arrest, Ruizdelatorre became upset, causing her to question the Defendant Officers, "why are you guys doing this to my boyfriend? Why are you guys doing this? He did not do anything." [D.E. 140 at 17].  In other words, she was protesting their decision to arrest Fragoso-Diaz.  When the officers began to lead Fragoso-Diaz out of her apartment, Ruizdelatorre persisted in her complaints. Although she was at that point covered in only a bath towel, she decided that the exigency of the situation required her to follow the officers as they marched Fragoso-Diaz down the stairs to the apartment building in handcuffs.  She followed right

behind them in what she described to be a frenzy.  Admittedly, she disputes the officers' account that she was screaming and cursing at them.  We assume the jury accepted her version of that dispute.  She did not dispute, however, that one or both officers were directing her to stay in her apartment and not follow them when they escorted Fragoso-Diaz to the street.  She persisted with her complaints all the way down the hall, down the stairs, and onto the sidewalk.  She was then arrested based in part on those facts.  We, again, assume that the jury credited her and her witnesses' testimony that she *did not* physically touch Fragoso-Diaz or the officers in an effort to stop them from placing Fragoso-Diaz inside the police vehicle.

Based on this record, the Defendant Officers take the position that Ruizdelatorre "interfered with the arrest of Fragoso-Diaz by continuing to pursue Defendant Officers, repeating these comments, and creating a dangerous situation for the officers and other present at the scene." *Id.*  Under Florida law, physical acts or conduct must accompany verbal protests or offensive words to support a conviction under section 843.02.  *See Wilkerson v. State,* 556 So. 2d 453, 455-56 (Fla. 1st DCA 1990) ("We have no doubt that the use of 'oppose' in conjunction with 'obstruct' manifests a clear and unambiguous intent to proscribe only acts or conduct that operate to physically oppose an officer in the performance of lawful duties."); *compare Francis v. State*, 736 So. 2d 97, 99 (Fla. 1st DCA 1999) (physically blocking an officer's path to investigate a beating in another room constituted obstruction of justice), *with State v. Dennis*, 684 So. 2d 848, 849 (Fla. 3d DCA 1996) (holding that police did not have probable cause to arrest defendant for obstruction when defendant yelled street term "ninety nine" to

alert drug dealer to the presence of undercover officers); *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995) (verbal protests and refusal to answer officer's questions, unaccompanied by physical opposition or threats, did not constitute obstruction); *J.G.D. v. State*, 724 So. 2d 711, 711-12 (Fla. 3d DCA 1999) (no probable cause to arrest for obstruction despite police order directing defendant to leave an apartment complex, despite his "loud and profane" protests, and despite the gathering of an "unruly crowd").

Based on these Florida precedents, the Eleventh Circuit concluded in *Davis v. Williams* that an objective officer does not have arguable probable cause to arrest a suspect for obstruction without some physical act that interferes with or obstructs the officer's actions. 451 F.3d at 765-66. Significantly, a suspect's physical presence and conduct at a scene of an arrest in very close proximity to the officers is required, to the point where the officers are physically distracted from performing their discretionary function. *Id.* Merely yelling, verbally protesting, insulting, or disrespecting officers are not enough, without some physical obstruction, to constitute a criminal offense. *Id.* at 766-67.

Although it is certainly a close call here, we conclude that the facts in this case, viewed in the light most favorable to Ruizdelatorre, cross that threshold to find arguable probable cause for obstruction of justice. Ruizdelatorre repeatedly placed herself only a few feet behind the officers as they moved Fragoso-Diaz from his apartment to their police car. She disregarded Officer Castillo's commands that she stay back from the officers. She instead followed them from the apartment down the

sidewalk, while protesting the officers' actions in a frenzied state, questioning why they were arresting her boyfriend, complaining that they did nothing wrong, all in an effort to prevent them from carrying through with their arrest.

Admittedly, the record from her perspective does not support a conclusion that she physically blocked their exit from the apartment, or tried to get in their way down the stairs, or ever physically reached to grab Fragoso-Diaz away from the officers as they claimed at trial. Nor is there any evidence that she made physical or verbal threats towards the officers. And if only respectful verbal protests or even obscenities disrespecting the officers' authority were at play, arguable probable cause would not have arisen to an objective officer under those circumstances. *See, e.g., Skop*, 485 F.3d at 1139 (holding that where an individual "simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction.").

The undisputed record shows, however, that her verbal protests were coupled with her persistent physical presence immediately behind the officers despite their commands to stay back. This led the officers to turn to her when they arrived at the vehicle and decide to arrest her as well, exclaiming something like "all right, you're under arrest, too." An objective officer presented with these circumstances early that morning could reasonably conclude that Ruizdelatorre's actions rose to the level of impeding or interfering with the officers' exercise of a lawful duty.

The Eleventh Circuit's conclusion in *Davis v. Williams* was based on its examination of Florida law that led it to find that no arguable probable cause existed

in that case to sustain an arrest for obstruction but, significantly, *absent* physical acts or conduct.  451 F.3d at 765-66.  The Eleventh Circuit distinguished their facts from those in *Wilkerson v. State*, 556 So. 2d 453 (Fla. 1st DCA 1990).  That case involved officers at an arrest scene where they had drug dealers and customers on the ground to be searched for weapons.  The defendant emerged from a crowd of people that had formed across the street and began yelling and cursing at the officers.  *Id.* at 454.  She then refused to leave the area after an officer told her to leave, at least two times, because she was interfering with their efforts to make the arrests.  *Id.*  Ultimately she was arrested for obstruction under section 843.02.  The court in *Wilkerson* found that the defendant "was not arrested for merely yelling at the officers.  She was arrested only after she refused to leave the area where the officers were attempting to make arrests and determine that no weapons were on the persons being searched, *and because the officer considered her physical presence was obstructing or impeding him*." *Id.* at 456 (emphasis added).  This finding was what the panel in *Davis* deemed to be a dispositive difference between the facts in their case, which did not involve a defendant physically maintaining a presence close to the arresting officers for purposes of impeding or distracting them, from the facts found in *Wilkerson* where the "court ruled that her presence *did* amount to a physical obstruction of the officer's ability to perform his job." *Davis,* 451 F.3d at 765 (emphasis in original).  *See also H.A.P. v. State,* 834 So. 2d 237  (Fla. 3d DCA 2002) (arguable probable cause to arrest for obstruction was found to exist when a defendant' cursing and shouting was coupled

with physical persistence at an arrest scene that became a physical distraction to the officers), *cited in Davis,* 451 F.3d at 765.

Based on these authorities, and relying on Ruizdelatorre's version of the arrest and the undisputed facts in the record, as we are obliged to do, we have no choice but to find that an objective police officer could reasonably find arguable probable cause to arrest Ruizdelatorre for obstruction under Florida law.  Her decision to impede the officers' process of arresting Fragoso-Diaz, by physically maintaining a presence immediately behind the officers, coupled with her emotional state and protestations, could be deemed to be a sufficient basis for an arrest.

That is not to say, of course, that we agree with the officers' conclusion.  Nor does it mean that a jury would, had the case ever reached that point, agreed that all the elements required for obstruction were satisfied here beyond a reasonable doubt. The state indeed chose not to prosecute the case.  Nevertheless, we only find that a reasonable officer could conclude that Ruizdelatorre's actions that morning amounted to "oppos[ing] or . . . obstruct[ing] a law officer in the execution of the officer's duty, [or] attempt[ing] to oppose or to obstruct the officer."  *Storck v. City of Coral Springs,* 354 F.3d 1307, 1317 (11th Cir. 2003) (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir. 1993); *see also Dahl v. Holley,* 312 F.3d 1228, 1233 (11th Cir. 2002) (holding that the probable cause standard is met if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in

believing' that [the suspect] had committed or was committing an offense") (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L.Ed.2d 589 (1991)).

Therefore, as a matter of law, Ruizdelatorre failed to establish that the Defendant Officers could not claim qualified immunity because arguable probable cause is present in this record. The jury's verdict in favor of Ruizdelatorre must be set aside pursuant to Rule 50(b).

### *(c)  Breach of the Peace / Disorderly Conduct*

Lastly, Defendant Officers maintain that there was arguable probable cause to arrest Ruizdelatorre for breach of the peace / disorderly conduct pursuant to section 877.03.[5] Defendant Officers maintain that "Ruizdelatorre's actions in pursuing the police officers wearing only a towel, repeatedly questioning them as to the arrest of Fragoso-Diaz, acting in a manner that was anything but calm, in a state she described as a "frenzy," [and] causing people to gather at the scene" gave rise to arguable probable cause to arrest her for disorderly conduct. In fact, Defendant Officers go so far as to suggest that they "could have arrested Ruizdelatorre much earlier than they did." [D.E. 140 at 23]. Though it is superfluous at this point given our preceding conclusion, for the benefit of the appellate court, if necessary, we still reject these arguments for two reasons.

---

[5]     Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 755.082 or s. 775.083. *See* Fla. Stat. § 877.03.

First, Defendant Officers waived the right to bring a Rule 50(b) motion on this issue because they did not raise a motion for a judgment as a matter of law under Rule 50(a) at the close of evidence at trial. *Celebrity Cruises, Inc.*, 394 F.3d at 903. The purpose of the requirement that the initial Rule 50(a) motion be made before the case goes to the jury "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." Fed. R. Civ. P. 50(a)(2) advisory committee notes (1991 amendment). During trial, Defendant Officers did not move for judgment as a matter of law seeking qualified immunity on the arrest pursuant to section 877.03. Nor did they raise an argument that could be liberally construed as "closely related" to their position here. *See Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1289-90 (11th Cir. 1998) ("If the grounds argued in a motion under Rule 50(a) are "closely related" to those argued in a Rule 50(b) motion, then setting aside a jury's verdict is no surprise to the non-movant. No Seventh Amendment right is ambushed. [*National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545, 1549-50 (11th Cir. 1986).] But if the new and old grounds vary greatly, then a trial judge may not rely on the new grounds to set aside the jury's verdict. *See* [*Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 845-46 (5th Cir. 1975).] If they do vary greatly and the trial court relies upon the new grounds to set aside the jury's verdict, we will reverse."). Their 50(a) arguments at trial were geared solely towards arguable probable cause to arrest for disorderly intoxication under section 856.011 and obstruction under section 843.02.

Second, to the extent one would construe the Defendant Officers' newly-raised argument as raising a pure legal error in the judgment through a Rule 50(b) motion, the argument still fails.  Probable cause for purposes of section 877.03, similar to probable cause for purposes of section 843.02, cannot be based on "mere words." *Williams*, 451 F.3d at 766 (citing *Butler v. Dowling,* 750 So. 2d 674 (Fla. 4th DCA 1999) (finding no arguable probable cause under section 877.03 when plaintiff was not using profanity, was not yelling, and was not agitated)).  Viewing the evidence in a light most favorable to Ruizdelatorre, her actions did not "corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them," nor did she "engage[] in brawling or fighting." *See* § 877.03.  Ruizdelatorre's testimony precludes a finding of disorderly conduct when she denies using any physical force or offensive touching against the officers.  Unlike the obstruction charge, there was no arguable probable cause to arrest her for disorderly conduct.

### 2. *Any Constitutional Violation was not Clearly Established*

The second prong of the qualified immunity analysis requires the plaintiff to show that "the law 'must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.'" *Stanley v. City of Dalton, Georgia,* 219 F.3d 1280, 1285 (11th Cir. 2000).  The conduct must have been clearly unlawful in light of pre-existing law.  *See Vinyard v. Wilson,* 311 F.3d 1340, 1350 (11th Cir. 2002) ("'[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was

unconstitutional.'" (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002)).

There are a number of ways a plaintiff can demonstrate that his right was clearly established. *E.g., Mercado v. City of Orlando,* 407 F.3d 1152, 1158 (11th Cir. 2005). A plaintiff can show "that a materially similar case has already been decided, giving notice to the police."[6] *Id.* It could also be shown "that a broader, clearly established principle should control the novel facts in this situation." *Id.* "Finally, [a plaintiff] could show that this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Id.*

In a false arrest context, this inquiry is straightforward as our binding precedent clearly holds that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. *Skop*, 485 F.3d at 1143; *Williams*, 451 F.3d at 764 n. 8; *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998); *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) ("We find that, at the time Defendants arrested Plaintiff, the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the Fourth Amendment.").

Defendant Officers argue here that, even if arguable probable cause did not exist to arrest her, qualified immunity still exists because:

---

[6]     In such a case a plaintiff "must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida" of such factually similar circumstances to have put officers on notice their conduct on the date of the arrest amounts to a constitutional violation. *Id.* at 1159.

>Plaintiffs would be hard pressed to identify sufficiently similar caselaw to our facts establishing Ruizdelatorre's arrest – after pursuing the police officers wearing only a towel, repeatedly questioning them as to the arrest of Fragoso-Diaz, acting in a matter that was anything but calm, in a state she described as a "frenzy," causing people to gather at the scene – violated clearly established law.   The arrest made under these circumstances has not been sufficiently described in court precedent to have put these officers on notice that such an arrest could amount to a violation of a clearly established constitutional right.

[D.E. 140 at 24].

Our task, therefore, is to determine if the state of Fourth Amendment law conferred fair warning on the officers that their arrest of Ruizdelatorre was unconstitutional.   *See, e.g., Vinyard,* 311 F.3d at 1350.   It is certainly clearly established that an arrest made without probable cause violates the Fourth Amendment.  *Davis,* 451 F.3d at 764.  On the other hand, very unique circumstances, or the presence of dispositive facts that were not known to the officers, may require a further examination of how well established the law underlying the given charges was at the time of the arrest.  *See, e.g., Durruthy v. Pastor,* 351 F.3d 1080, 1092-93 (11th Cir. 2003).

We conclude that false arrest cases like *Davis* and *Skop* clearly provided the Defendant Officers fair notice that physical acts or conduct were essential components of an obstruction charge.  Thus, regardless of the circumstances that led to the officers' initiation of their investigation, whether that was based on a 911 call or otherwise, Florida officers are charged with the knowledge that persons they encounter can be charged with obstruction based on a person's use offensive words or verbal protests

directed at the officers, but only when accompanied by physical opposition or threats. *See, e.g., Davis,* 451 F.3d at 765.

At the same time, the Eleventh Circuit's examination of Florida law *does not* give fair notice to a reasonable police officer that probable cause would be lacking even where a defendant purposefully and persistently maintained a personal presence immediately behind officers conducting an arrest, ignoring their commands to stay back, while verbally protesting the arrest in a frenzied state. In other words, if *Skop* and *Davis* clearly establish that an officer is violating the Fourth Amendment when arresting someone absent these circumstances, they must also support an officer's decision to arrest that person for obstruction, under Florida law, when those very same circumstances are present. Here, the critical elements for obstruction were present; obstruction and physical conduct. The law is *not* clearly established that the Fourth Amendment is still violated notwithstanding the satisfaction of both these elements.

Accordingly, even if we now determined that arguable probable cause was missing in this case, Ruizdelatorre has still failed to meet her burden to show that Defendant Officers are not entitled to qualified immunity. Even when we view the evidence in a light most favorable to her, the Defendant Officers did not violate a clearly established Fourth Amendment right when they arrested her that morning. *Davis* especially supported the officers' analysis of Florida law as it relates to Ruizdelatorre. That analysis is, therefore, cloaked with qualified immunity.

### C.   *CMB is Also Entitled to Judgment Under State Law*

At trial, CMB moved for judgment as a matter of law on Ruizdelatorre's state law claim for false arrest.  We denied the Rule 50(a) motion and submitted the claim to the jury.  Ultimately, the jury  found "from the greater weight of the evidence in Plaintiff Marisol Ruizdelatorre's favor on the state law claim of false arrest against Defendant City of Miami Beach." *See Verdict Form* [D.E. 132 at 1].

Here, CMB renews its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), and argues that Defendant Officers had probable cause to arrest Ruizdelatorre for resisting an officer without violence, disorderly intoxication, or breach of the peace / disorderly conduct.  CMB's motion mirrors the Rule 50(b) motion filed by Defendant Officers.  For the reasons discussed above, Ruizdelatorre failed to meet her burden of showing that the Defendant Officers did not have arguale probable cause to arrest her for the obstruction charge.  Ruizdelatorre also failed to show that any Fourth Amendment violation, given these circumstances, was clearly established under Eleventh Circuit or Florida precedents.  Therefore, we are obliged to grant CMB's motion for judgment as a matter of law.  *See Pickett,* 420 F.3d at 1278; *Rankin v. Evans,* 133 F.3d 1425, 1433-34 (11th Cir. 1998) ('This Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law. . . ." (quoting *United States v. Ullrich,* 580 F.2d 765, 769 (5th Cir. 1978) and *State v. Outten,* 206 So. 2d 392, 397 (Fla. 1968))).

### III.   ANALYSIS - RULE 59

Defendant Officers and CMB jointly filed a Motion for New Trial pursuant to Fed. R. Civ. P. 59. [D.E. 149]. The motion raises three distinct grounds for a new trial: (i) Plaintiffs violated the pre-trial stipulation by injecting race into the trial; (ii) Plaintiffs' closing argument was overly prejudicial; and (iii) the verdict is against the great weight of the evidence. The parties also independently filed motions for remittitur. Defendant Officers argue for remittitur and maintain that verdict is both excessive, and disproportionate compared to jury awards in similar false arrest cases. [D.E. 147]. CMB moves for remittitur on these same grounds, but also insists that the damage award should be reduced pursuant to Florida's sovereign immunity statute, Fla. Stat. § 768.28(5). [D.E. 148].

These issues, for purposes of Ruizdelatorre, are now moot given the Court's ruling on the Defendants' Rule 50(b) motions. As judgment should be entered against Ruizdelatorre and in Defendants' favor for the reasons analyzed in the preceding section, a new trial or remittitur order is unnecessary. But, for the benefit of the parties and the Court of Appeals, the Court will also conditionally address the Rule 59 arguments raised in Ruizdelatorre's case, as required by Rule 59(c). *See, e.g., Christopher v. Florida*, 449 F.3d 1360, 1365 (11th Cir. 2006).

For the reasons addressed in more detail below, Defendants' motion for a new trial on liability should be denied but a new trial or remittitur order should be granted based on the excessive damage award.

### A.   *Standard of Review*

Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, a court may grant a new jury trial "'for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A party may seek a new trial by arguing that "the verdict is against the great weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940); *Steger v. General Elec.* Co., 318 F.3d 1066, 1081 (11th Cir. 2003). However, a motion brought pursuant to Rule 59 may not "relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (motion to amend or alter judgment was essentially a motion to reconsider the district court's prior summary judgment order).

Resolution of a motion for a new trial is committed to the discretion of the trial court. *See Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999). When ruling on a motion for a new trial, the judge must determine "if in his opinion, 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Insurance Co. of N. America v. Valente*, 933 F.2d 921, 922-23 (11th Cir. 1991) (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984)).

"[T]o assure that the judge does not simply substitute his judgment for that of the jury, . . . we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Id.* at 923 (quoting *Hewitt,* 732 F.2d at 1554). The judge must protect against manifest injustice in the jury's verdict, but it is not her role to assess credibility where conflicting testimony has been presented during the trial. *Id.* at 1558-59. Instead, the judge must defer to the jury on the weight to be given to each witness's testimony. *Id.*

Finally, when a court finds that a jury's award of damages is excessive it may grant the defendant a new trial. *E.g., Johansen,* 170 F.3d at 1329 (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433, 116 S. Ct. 2211 (1996)); Fed. R. Civ. P. 59. Alternatively the court can enter a remittitur order and reduce the damages to the highest allowable amount under the law, which the plaintiff can accept or instead seek a new trial on damages. *See, e.g., Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d 1304, 1310 (11th Cir. 1990); *Wilson v. Taylor,* 733 F.2d 1539, 1549–50 (11th Cir. 1984), *overruled on other grounds, Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989). Pursuant to the Seventh Amendment, a plaintiff must be given that option of a new trial in lieu of remitting a portion of the jury's award. *See* U.S. Const. amend. VII; *Johansen*, 170 F.3d at 1329 ("[N]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact."). Finally, the decision whether to grant a new trial or remittitur on the grounds of excessive

damages is also a matter within the sound discretion of the district court. *E.g.,* *Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241, 1249 (11th Cir. 2001); *Simon,* 895 F.2d at 1310.

## B. *Plaintiffs Did Not Improperly Inject Race into the Trial*

First, Defendants request a new trial on the basis that Plaintiffs impermissibly tainted the jury by suggesting that Fragoso-Diaz's arrest was racially motivated. "[W]here the interest of substantial justice is at stake, improper argument may be the basis for a new trial . . . ." *Christopher,* 449 F.3d at 1367 (citing *McWhorter v. Birmingham*, 906 F.2d 674, 677 (11th Cir. 1994)).  Defendants surmise that Plaintiffs and Plaintiffs' counsel directly violated the pre-trial stipulation by "injecting race" into the trial.

Before the jury was selected, the parties stipulated that no evidence concerning racial motivation would be introduced at trial. [D.E. 149 at 6].  Defendant Officers point to the following colloquy that occurred during Fragoso-Diaz's direct examination as evidence that Fragoso-Diaz violated the pre-trial stipulation:

Q.    Did Ferbeyre say anything while he was putting the cuffs on?

A.    He was like, that's it, he said, that's it.  You know, I don't really remember exactly what he said but I know that he was talking.

[ ... ]

Q.    Did you hear him announce at any point -

A.    I almost said that but I really don't remember what he said, and I know he did not say that.  I know he was insulting Michelle.

[ ... ]

Q.     When did you hear that insult?

A.     When he was arresting him, he was insulting him. I even think he said the – word, but I'm not going to say that I know for sure.

Papy.  Your honor.

A.     I know you [Defense counsel] said you did not want to make it a race case.

Papy.  I move for sidebar.

Court.  Overruled. The answer will be stricken, ignore her answer.  Ask the next question.

[D.E. 149 at 7].

Defendant Officers suggest that Plaintiffs' counsel compounded the problem by arguing in closing argument that "[t]hey won't be in prison for speaking out against the government, like they are in Cuba and they won't have police officers go into their houses in the middle of the night just because they don't like what they look like to just because they are who knows what." [D.E. 149 at 9].  Based on this conduct, Defendants feel that the "only appropriate remedy would be an order granting a new trial." *Id*.  We disagree.

As to the conduct of Ruizdelatorre when she testified, her statement, albeit improper, was brief.  Even if the statement was a flat out lie, made intentionally to inflame the jury, Defendants had ample opportunity to cross-examine her and challenge the veracity of her statement.  Had this testimony been as damaging as Defendants suggest, presumably Defendants would have spent a significant amount of cross-examination on the issue, but they did not do so.  Instead, Defendants objected

to the testimony, the Court sustained the objection along with a curative instruction, and the case went forward.  No further remedy is warranted.

The record similarly fails to support the accusation that Plaintiffs' counsel intentionally violated the pretrial stipulation.  There was nothing suspicious about the questions asked on his direct examination of Fragoso-Diaz, i.e. there was no attempt to elicit improper testimony.  Moreover, counsel's statements in closing argument did not "inject race" into the trial.  Statements attempting to juxtapose this case with the Cuban prison system, were not so prejudicial such that they could have an effect on the outcome.  Ultimately, the Court finds that each side was able to present its case. Notwithstanding the final verdict, counsel for Plaintiffs and Defendants adequately and forcefully presented arguments to the jury.  The trial was fair in every material respect.

### C.   *Plaintiffs' Closing Argument was not Overly Prejudicial*

Defendants argue that the closing argument of Plaintiffs' counsel was permeated with prejudicial and improper statements of such quality and quantity that we must order a new trial.   Defendants cite to thirteen different supposedly improper statements in Plaintiffs' closing argument.  Notably, they only objected to one of the statements when it was made during closing argument. [D.E. 149 at 14-17].   In response, Plaintiffs take the position that the closing arguments were not improper, not prejudicial, not objected to, and that any possible prejudice was cured by the Court's instructions. [D.E. 166 at 5-7].

Generally, a timely objection is necessary to bring to the district court's attention error in counsel's arguments. *E.g., Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993). When no objections are raised, we review the arguments for plain error, but a finding of plain error "is seldom justified in reviewing argument of counsel in a civil case." *Id.* (quoting *Woods v. Burlington Northern R.R. Co.*, 768 F.2d 1287, 1292 (11th Cir. 1985) (per curiam), *rev'd on other grounds*, 480 U.S. 1, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987)). Only when the interests of substantial justice are at stake should the court order a new trial. *McWhorter*, 906 F.2d at 677 (counsel's reference to excluded evidence in direct contravention of the district court's order constituted prejudicial error). The philosophy underlying this rule is aptly summarized in *Woods*:

> Requiring timely objection prohibits counsel from "sandbagging" the court by remaining silent and then, if the result is unsatisfactory, claiming error. Second, there are a number of good reasons why skilled trial counsel may make a tactical decision not to object to improper argument: (1) an argument that looks highly improper in a cold record may strike counsel as being wholly lacking in effect; (2) because of the 'chemistry' of the courtroom counsel may think that the improper argument may offend and in effect backfire; and (3) the improper argument may open the door to a response that will be of more value than a sustained objection.

*Woods*, 768 F.2d at 1292 (citations omitted).

Defendants portion the purportedly improper arguments into five categories: (i) statements for which there was no supporting evidence; (ii) outright misstatements of the evidence calculated to mislead the jury; (iii) expressions of counsel's personal opinions; (iv) references to specific jurors in violation of the "Golden Rule"; and (v) implications that insurance would cover an adverse verdict. [D.E. 149 at 14].

Notwithstanding the litany of improper statements, we find that Defendants are not entitled to a new trial.

Primarily, we reach this decision because Defendants made no attempt to object to these arguments at the time they were made.  Defendants could have raised objections, and these objections would likely have been sustained. But Defendants made the strategic decision to stay silent in the face of objectionable statements made by opposing counsel.  This amounts to a waiver given the type of statements made in this case because, without an objection, the Court had no opportunity to remedy the situation. *See, e.g., Miledy Strait v. Busch Entertainment Corp.*, 2007 WL 496607, *2 (M.D. Fla., Feb. 12, 2007) (citations omitted).

To be fair, counsel's closing argument was riddled with improper statements. For instance, counsel improperly voiced personal opinions: "I spend my whole life every day, enraged.  Enraged about the war in Iraq, enraged about what's happening in China, enraged about what happened just everywhere.  I spend my life being enraged at how people treat each other." [D.E. 149 at 16].  Raising controversial geopolitical issues during closing argument risked alienating the jury, and, if anything, harmed counsel's credibility.  Defendants made a calculated decision *not* to object to this statement, and frankly, we cannot say that this strategy was unreasonable.  But Defendants cannot now turn back the clock to object to these comments after the fact merely because of the unsatisfactory jury verdict.

We nevertheless reviewed each of the claims in context and have determined that counsel's statements did not warrant a new trial.  *See Oxford*, 984 F.2d at 1129.

One statement, however, deserves particular attention because Defendants raised a timely objection:

> Norkin: So ladies and gentlemen I want to remind you please when you're thinking about the damages, because it's not on the verdict form, remember it's for past damage and future damages. Not just in the past. Because people have to live with what they went through, being held powerless by people of authority. They cannot do anything, they can't say anything to them for fear they will get beaten more ... It's like Abu Gharaib when they humiliated those people.

> Switkes: Objection.

> The Court: Sustained.

> Norkin: No, it's just a comparison.

> The Court: Sustained.

> Norkin: No, I'm just saying –

> Switkes: Objection, Your Honor.

> The Court: Sustained.

> Norkin: Fine.

> The Court: Make your last point.

[D.E. 149 at 14-15]. In this case, a timely objection resulted in immediate relief, and counsel was forced to abandon his irrelevant argument. We recognize that counsel comparing Plaintiffs' case or referencing in any way the Abu Ghraib prison scandal was inappropriate, highly inappropriate. Having witnessed the jurors' reactions to this statement first hand, however, we are confident that they afforded it as much credence as it deserved: none.

In the end, based on the thorough and careful exercise of our discretion, we conclude that any improper argument by counsel did not rise to the level of a miscarriage of justice or an unfair trial.  The jury weighed the conflicting evidence carefully, believed the Plaintiffs' and their witnesses' testimony, most likely ignored the ramblings of their lawyer, and rendered a verdict that is supported by the evidence presented.  The Court instructed the jury to consider only the evidence and that anything the lawyers say is not evidence.  And the Court evaluated the jurors' response to Plaintiff's counsel's statements that evidenced that the jurors were not taken off course by any over-the-top statements made in closing argument.

That being said, the jury's award in favor of Ruizdelatorre was extremely high given the amount of damage evidenced presented.  It is thus also possible that counsel's inappropriate comments inflamed to jury to some extent.  The solution to that particular problem can be addressed separately (as discussed below).  A new trial on liability, however, based solely on the inappropriate nature of certain statements in the closing argument that were largely not objected to, should not be granted.

### D.    *The Jury Award Was Excessive*

Finally, Defendants argue that they are entitled to a new trial, or alternatively, a remittitur of the jury's verdict.  The jury awarded Ruizdelatorre $175,000 against Defendant Officers and CMB.  Defendants argue that the evidence presented at trial was insufficient to support this award.

To remit the § 1983 compensatory damages award in this case, the Court must determine the compensatory damages award "is so high as to shock the judicial

conscience and constitute a denial of justice." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2nd

Cir. 2003) (citing *Mathie v. Fries*, 21 F.3d 808, 813 (2d Cir. 1997)).  "In order to shock

the sense of justice of the judicial mind the verdict must be so excessive or so

inadequate so as to at least imply an inference that the verdict evinces or carries an

implication of passion or prejudice, corruption, partiality, improper influences, or the

like." *Slip-n-Slide Records, Inc. v. TVT Records, LLC*, 2007 WL 3232274 (S.D. Fla. Oct.

31, 2007) (citing *Hipp v. Liberty Nat. Life Ins. Co.,* 65 F. Supp. 2d 1314, 1344 (M.D. Fla.

1999)).

For the state law false arrest claim, Florida law determines whether a jury

award is excessive, while federal law governs the procedural question of whether a new

trial is warranted if the damages are found to be excessive.  *See, e.g., Hattaway v.

McMillian,* 903 F.2d 1440, 1450 (11th Cir. 1990). As Florida courts recognize, there is

an element of speculation in most tort cases:

> Where recovery is sought for a personal tort, or where punitive damages
> are allowed, we cannot apply fixed rules to a given set of facts and say
> that a verdict is for more than would be allowable under a correct
> computation.  In tort cases damages are to be measured by the jury's
> discretion.  The court should never declare a verdict excessive merely
> because it is above the amount which the court itself considers the jury
> should have allowed.  The verdict should not be disturbed unless it is so
> inordinately large as obviously to exceed the maximum limit of a
> reasonable range within which the jury may properly operate.

*Bould v. Touchette*, 349 So. 2d 1181, 1184-85 (Fla. 1977).  A party who assails the

amount of a verdict as being excessive has the burden of showing it is unsupported by

the evidence, or that the jury was influenced by passion or prejudice. *Id.*

To be sure, damages for emotional distress or mental anguish are difficult to measure. *Copley v. BAX Global, Inc.*, 97 F. Supp. 2d 1164, 1171 (S.D. Fla. 2000) (citations omitted). The Court has no doubt that Ruizdelatorre suffered emotional distress as a result of this incident, especially considering that she was subjected to the humiliation of being forced to stand nude while being handcuffed in front of her apartment. She was also ridiculed when taken to the police station, where she was jailed and later released. That injury should not be minimized simply because it is not readily observable or easily converted to a monetary figure.

Nevertheless, in assessing the appropriateness of an award of compensatory damages, courts look to: (1) the size of the award; (2) the rational relationship between the award and the evidence adduced at trial; and (3) awards in similar cases. *Id.* at 1172. As to the first and second prongs, Ruizdelatorre did not present evidence as to any medical bills incurred, physical injuries, or lost wages. She did not present any evidence that she has been financially harmed in any way as a result of Defendants' conduct. At best, she presented limited evidence of psychological damages, but did not have an expert psychologist or psychiatrist testify at trial as to Ruizdelatorre's supposed ailment. In fact, she admitted the she did not see a doctor, psychologist, or any other medical professional subsequent to her arrest. Rather, she relied solely on her own claims that she has "suffered" as a result of this incident.

Reasonable people, and thus reasonable juries, could differ as to an amount that would compensate Ruizdelatorre for her suffering, but $175,000 is beyond the realm of reasonableness. The Court conducted a wide search of jury verdicts in this district

concerning claims for false arrest, and the damage awards were a fraction of the award in this case. *See Sterling Thomas Cowart v. Broward County Sheriff, et al.,* No. 05-cv-60862, 2007 WL 5273724 (S.D. Fla., June 8, 2007) (awarding $15,000 for physical and/or emotion damages in a section 1983 claim for false arrest); *Jones v. Sheriff of Broward County*, No. 92-6913, 1995 WL 684469 (S.D. Fla., Aug. 21, 2995) ($37,000 award for violation of civil rights for unlawful search and seizure and state torts of false arrest; after defendant was acquitted of criminal charges, he was sent back to jail and strip searched, and remained in jail for several hours before his release); *Davis v. Deputy Edward Becht*, No. 03-01519, 2007 WL 4523028 (M.D. Fla., Mar. 8, 2007) ($43,962 verdict for unlawful arrest; $20,000 for physical pain, emotional pain, and mental anguish, the remainder for medical expenses and loss of income).

The former Fifth Circuit in *Keyes v. Lagua,* 635 F.2d 330 (5th Cir. 1981), reversed an award of $75,000 in favor of two plaintiffs for false arrest and excessive force under § 1983.  After affirming liability, the appellate court reversed the damage award because such an award for an unlawful detention that lasted two hours, where no evidence of any medical or psychological injury was presented, any force used resulted in only headaches, numbness, bruising, as well as anxiety and nervousness. "The conduct of the defendants undoubtedly caused Mrs. Keyes pain and suffering, and credible evidence established that she suffered emotional reactions such as heightened anxiety and loss of sleep, but the award appears to us to be beyond the maximum possible recovery for those items-according to the evidence in this record." *Id.* at 336.

In today's dollars, the judgment reversed in that case, adjusted for inflation, was $171,000.

In relationship to these cases, a single award for a single plaintiff for $175,000 is simply excessive, when that award is based on a single false arrest, leading to physical and mental anguish but without any evidence of long-term injury or tangible harm. As the Court in *Keyes* found, an award of that magnitude is simply outside the maximum possible amount that the law allows. To be fair, of course, the injury here is far greater than the more minimal injury suffered in *Keyes,* which did not result in an incarceration for any period of time. Here, a higher award is clearly supportable under the law for a single plaintiff who suffered great humiliation and mental trauma due to the purported unlawful actions of the officers.

But as the other cases cited above show, quite similar occurrences resulted in far lesser damage awards than the one at issue in this case. Absent greater evidence of long-term physical or mental injury, a $275,000 award to a single plaintiff is not sustainable. There are, of course, outliers where juries and courts awarded higher amounts, but these cases are largely factually distinguishable precisely because the plaintiffs in those cases suffered a greater degree of physical injury or long-term emotional harm. *See, e.g., Rivera v. Miami-Dade County, et al.*, No. 03-11431 CA 20, 2006 WL 4468139 (Fla. Cir. Ct. 11th Oct. 4, 2006) (consolidated case where three individuals were falsely arrested on non-bondable offenses; plaintiffs remained in custody for a total of twelve, twenty-two, and thirty-three days, and jury awarded damages of $83,432,$94,800, and $128,910, respectively); *Nguyen, M.D. v. Deputy*

*Kenneth Carlisle, et al.*, No. 04-cv-00026, 2006 WL 4099923 (N.D. Fla., Sept. 21, 2006) (verdict of $1,836,100 for false arrest and malicious prosecution; vast majority of damages stemming for loss of reputation and harm to plaintiff's medical practice).

The Eleventh Circuit recently in fact affirmed a jury's verdict and the denial of a motion for new trial/remittitur for a compensatory award on a false arrest and battery claim of $225,000. *See Edman v. Marano*, 177 Fed. Appx. 884, 2006 WL 1025030 (11th Cir. 2006). We point out, however, that the plaintiff in *Edman* introduced tangible medical evidence that he suffered from post-traumatic stress disorder that he developed as a result of the false arrest.

Moreover, we have to also take into account that the jury's award on the false arrest claim may have been inflamed, and thereby influenced by undue passion, from some of the inflammatory statements made by counsel during his closing argument. The Court must now take that into account as well. *See Christopher*, 449 F.3d at 1368, n.11 ("We see the jury's award of excessive damages as proof that Plaintiff's counsel's misconduct probably influenced the jury").

In the exercise of our discretion, therefore, and assuming that our judgment in the Defendants' favor does not withstand review, we conditionally conclude that a new trial on damages is necessary, but an alternative remittitur order is also appropriate. *See, e.g., Middlebrooks,* 256 F.3d at 1249. Under the Seventh Amendment, the Court must offer Fragoso-Diaz the choice of a new trial or a remittitur. *See Johansen,* 170 F.3d at 1329. Given the nature of this evidence, and based solely on the false arrest claim surviving Rule 50(b) review, we find that an award of $75,000 is the highest

possible damage award that the evidence supports in Ruizdelatorre's favor.  The Court, if necessary, would grant Ruizdelatorre the option of a new trial or remittitur on the basis of an excessive damage award.

Finally, we note that CMB's motion for new trial argues that the Court should remit the award to the highest possible amount recoverable under Florida's sovereign immunity statute, Fla. Stat. § 768.28(5).  Given the Court's decision to grant a new trial on damages or a remittitur to an award of $75,000.00, this portion of CMB's motion is moot.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      Defendant Officers Noel Castillo's and Antonio Ferbeyre's Motion for Judgment as a Matter of Law [D.E. 140] is **GRANTED**.  An Amended Judgment shall be entered in Defendant Officers Noel Castillo's and Antonio Ferbeyre's favor on all claims raised by Plaintiff Marisol Ruizdelatorre in the Amended Complaint.

2.      Defendant City of Miami Beach's Motion for Judgment as a Matter of Law [D.E. 145] is **GRANTED**.  An Amended Judgment shall be entered in Defendant City of Miami Beach's favor on all claims raised by Plaintiff Marisol Ruizdelatorre in the Amended Complaint.

3.      Defendants' Joint Motion for New Trial [D.E. 149] is conditionally **GRANTED IN PART AND DENIED IN PART**.  To the extent that Judgment should not be entered in Defendants' favor under Rule 50(b), and subject to Plaintiff Marisol

Ruizdelatorre's acceptance of the Court's remittitur, the Court will order a remittitur of the total compensatory damage award to $75,000.00 and enter an Amended Judgment accordingly.  If the remittitur is not accepted, a new trial shall be held limited to the determination of the amount of damages that should properly be awarded in this case.  Defendants' Motion is in all other respects Denied.

4.     Defendant Officers Noel Castillo's and Antonio Ferbeyre's Motion for Remittitur [D.E. 147] is conditionally **GRANTED** in accordance with ¶ 3 of this Omnibus Order.

5.     Defendant City of Miami Beach's Motion for Remittitur [D.E. 148] is conditionally **GRANTED** in accordance with ¶ 3 of this Omnibus Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of December, 2008.

_____
EDWIN G. TORRES
United States Magistrate Judge