# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 06-21183-CIV-TORRES

### CONSENT CASE

MARISOL RUIZDELATORRE and
MICHELLE FRAGOSO-DIAZ,

      Plaintiffs,

v.

CITY OF MIAMI BEACH, a Florida
municipal corporation; Officer ANTONIO
FERBEYRE; Officer NOEL CASTILLO,

      Defendants.

_____/

## OMNIBUS ORDER ON RULE 50 AND 59
## MOTIONS WITH RESPECT TO PLAINTIFF MICHELLE FRAGOSO-DIAZ

This matter is before the Court on five motions: (i) Defendants, Officer Noel
Castillo and Officer Antonio Ferbeyre's Motion for Judgment as a Matter of Law [D.E.
140]; (ii) Defendant City of Miami Beach's Motion for Judgment as a Matter of Law
[D.E. 145]; (iii) Defendants, Officer Noel Castillo and Officer Antonio Ferbeyre's Motion
for Remittitur [D.E. 147]; (iv) Defendant, City of Miami Beach's Motion for Remittitur
[D.E. 148]; and (v) Defendants City of Miami Beach, Officer Noel Castillo and Officer
Antonio Ferbeyre's Motion for New Trial [D.E. 149].  Plaintiff Michelle Fragoso-Diaz
("Fragoso-Diaz") responded to these motions;  Officer Noel Castillo ("Castillo"), Officer
Antonio Ferbeyre ("Ferbeyre") (collectively "Defendant Officers") and City of Miami
Beach ("CMB") replied.  Accordingly, these matters are ripe for disposition.

# I.  BACKGROUND

On July 19, 2004, musicians Fragoso-Diaz and Marisol Ruizdelatorre ("Ruizdelatorre") performed at a nightclub on Miami Beach from approximately 11:00 p.m. until 3:00 a.m. the next morning.[1]  Following their performance, they stopped briefly at a sandwich shop where Fragoso-Diaz says he consumed one or two beers. After the sandwich shop, at approximately 5 a.m., Ruizdelatorre, Fragoso-Diaz, and a fellow band-mate, Armando Gola, all went to Fragoso-Diaz's apartment, where he and Ruizdelatorre were living together.

Though they were tired, the three musicians did not want to leave their equipment in the car and thus needed to move the equipment up the apartment building stairs and into their apartment.  They made several trips up and down the stairs as they transferred their musical equipment from the car to the apartment. Some of Fragoso-Diaz's neighbors, however, became upset about the early-morning raucous.  A verbal confrontation ensued between one elderly neighbor and Fragoso-Diaz about the noise that they were creating.  He tried to ignore her and finish the task.  Gola then left the apartment about fifteen minutes later.

In the meantime, the elderly neighbor, Daniela Atanasova, called the police several times complaining of noise and a domestic disturbance.  At about 6:00 a.m., Defendant Officers went to Fragoso-Diaz's apartment in response to a dispatch call

---

[1]      The trial testimony and court record provide the basis for the summary of facts that are material to the issues presented, stated in the light most favorable to Fragoso-Diaz, the non-moving party.  We include primarily those facts relevant to his claims.

requesting assistance for what was described to be a 34D "domestic dispute." Defendant Officers knocked on Fragoso-Diaz's apartment door and he opened the door.

From this point, the Defendant Officers' version of the events and that of Fragoso-Diaz and his former girlfriend, Ruizdelatorre, vary greatly. Drawing all inferences in the record in Fragoso-Diaz's favor, the facts show that he could hear the officers approaching the door and immediately opened the door. Fragoso-Diaz was eager to explain to them that there was no problem and that the elderly neighbor was wrong. The Defendant Officers immediately questioned why he was making so much noise and disturbing his neighbors. The Officers moved into the apartment, without Fragoso-Diaz's express consent, where they could see the musical equipment, and at which point they questioned why they were having a party and blasting music. They instructed Fragoso-Diaz to sit down on the couch as they looked around the apartment. Fragoso-Diaz told them that they were not having a party and that his girlfriend was in the shower. Fragoso-Diaz said that he knew his rights and asked them to leave the apartment until Ruizdelatorre could get dressed.

At that point Ruizdelatorre came out of the bathroom in a scared manner and asked why Fragoso-Diaz had let them enter and asked the officers why they were there. The Defendant Officers then engaged Ruizdelatorre, who at that point was only wearing a bath towel. At some point Ruizdelatorre told the officers she was going to call her father to let him know what was happening. Officer Ferbeyre reacted by then turning to Fragoso-Diaz, saying "that's it," and proceeded to arrest him. He grabbed his hands, lifted him from the couch, and handcuffed him. He then began pushing Fragoso-Diaz out of the apartment.

Ruizdelatorre then immediately followed the Defendant Officers as they escorted Fragoso-Diaz down the hall and down the stairs, all the while protesting his arrest and asking the officers why they were doing what they were doing. The lead officer was pushing Fragoso-Diaz down the stairs, grabbing his arms and hair, while Officer Castillo was commanding Ruizdelatorre to stay back. Ruizdelatorre did not stay back and, instead, followed them down the stairs to the street level. The Officers then began placing Fragoso-Diaz into their police cruiser, at which point they also arrested Ruizdelatorre. The Defendant Officers proceeded to transport Fragoso-Diaz and Ruizdelatorre to the police station, where they charged Fragoso-Diaz with disorderly intoxication under Fla. Stat. § 856.011 and resisting an officer without violence / obstruction in violation of Fla. Stat. § 843.02.

Fragoso-Diaz's bandmate, Gola, testified at trial and also generally supported the plaintiffs' account of the events that morning. He testified that they had not been trying to create a disturbance when they arrived at the apartment, and tried not to get the elderly neighbor more upset than she was. He also testified that, when he left the apartment and went downstairs, he was confronted by the officers who were acting belligerently. They demanded his identification and told him to leave the scene. When he saw them go up the stairs, he remained in the area, where he saw them emerge from the apartment building with Fragoso-Diaz handcuffed and Ruizdelatorre right behind. He testified that she was yelling for them not to arrest Fragoso-Diaz. They arrested her when she continued doing so as they placed Fragoso-Diaz up against their vehicle.

Defendant Officers testified that there was probable cause to arrest Fragoso-Diaz based on the two charges.  Not surprisingly, their testimony painted quite a different picture of the incident.  According to Defendants, they were investigating a domestic dispute, based upon the 911 call that had been made by the neighbor.  As they approached the apartment, they could hear yelling in the apartment, with a louder male voice and a female voice.  They testified that when they knocked on the door, Fragoso-Diaz opened the door belligerently, waiving his hands and arms at the officers, asking what they were doing there, with a strong smell of alcohol on his breath.  They testified that Fragoso-Diaz was acting in a threatening manner and would not control himself, at which point the officers decided to arrest him.  They testified that they did not in fact enter the apartment, and instead confronted Fragoso-Diaz at the doorway and hall area of the complex.  At that point, they could hear Ruizdelatorre yelling from inside the apartment, who dropped her towel to expose herself to the officers when she was yelling at them.  They ignored her and proceeded to arrest Fragoso-Diaz and take him down the stairs.

The jury also heard supporting testimony from Defendant Officers, Ms. Atanasova (the individual that called the police), and Ms. Atanasova's daughter, a fellow resident of the apartment complex where the incident took place.  The Atanasovas corroborated Defendant Officers' claims that noise was coming out of the apartment.

Again, the jury's verdict requires that we draw all conflicting inferences in Fragoso-Diaz's favor.  Consequently, we must find that the jury accepted his and his witnesses' contention that he opened the door in response to the officers, that they

pushed themselves into the apartment, that they placed him on the couch while they looked around the apartment, that he was demanding that they leave the apartment, and that they arrested him only after they confronted Ruizdelatorre and she threatened to call her father on the telephone.

We also consider Fragoso-Diaz's testimony that, after being arrested and while at the police station, he and Ruizdelatorre were being laughed at by the officers present, calling him "Lenny Kravitz and the naked girl." Then, when he was being placed in a jail cell, another officer, identified only as a black officer named "Smith," grabbed him by the hair pushed him against a concrete wall and banged his head on the wall two or three times. This gave Fragoso-Diaz a headache and dizziness that lasted two or three days. He had also been struck in the rib area.

Ultimately, Fragoso-Diaz proceeded to trial on four causes of action: (i) a section 1983 claim against Defendant Officers for unlawful arrest; (ii) a section 1983 claim against Defendant Officers for excessive force; and (iii) a state law false arrest claim against CMB,[2] and (iv) a state law battery claim against CMB.[3] On March 31, 2008, the Court held a five-day jury trial on damages. The key witnesses in the Plaintiffs

---

[2]     Plaintiffs' § 1983 claim against CMB for unlawful arrest was dismissed at the summary judgment stage [D.E. 90 at 30] because there is no respondeat superior liability in this case, absent additional circumstances, sufficient to make a municipality liable for the wrongful actions of its police officers in making a false arrest. Additionally, Plaintiffs' § 1983 claim against CMB for civil rights deprivations based on customs and practices was also dismissed on summary judgment.

[3]     Plaintiff's state law battery claim against the "Officer Smith" that supposedly assaulted Fragoso-Diaz at the jail cell was dismissed prior to trial as he had never been identified and never been served [D.E. 80].

case-in-chief were Ruizdelatorre and Fragoso-Diaz, along with supporting testimony provided by Armando Gola.

Following Plaintiffs' case-in-chief, and again before the close of the evidence, Defendant Officers moved for judgment as a matter of law on Fragoso-Diaz's section 1983 claims for false arrest and excessive force.  The Court denied the officers and CMB's motions because we assumed at that point that Fragoso-Diaz laid a sufficient evidentiary foundation in his case-in-chief to allow a reasonable jury to find in his favor on the unlawful arrest claim.  The Court denied the motion for judgment on the excessive force claims as against Officer Ferbeyre, as well as the state law battery claim against CMB.  The Court did grant the motion on the excessive force claim as against Officer Castillo as there was never any evidence presented that Officer Castillo had engaged in any unnecessary force imposed on Fragoso-Diaz.

The jury found in favor of Fragoso-Diaz on his federal claim of unlawful arrest against Defendant Officers and on his state law claim of false arrest against CMB.  *See* Verdict Form [D.E. 132].  The jury found in Officer Ferbeyre's and CMB's favor on the excessive force claim, yet it at the same time found in Fragoso-Diaz's favor on the state law battery claim against CMB.  The jury awarded Fragoso-Diaz $275,000 in damages. Strictly in accordance with the jury's verdict, and subject to Rule 50(b) considerations, the Court entered judgment on April 15, 2008 in Fragoso-Diaz's favor on Count III (false arrest against CMB) and Count VI (unlawful arrest against Defendant Officers), as well as Count IV (state law battery against CMB) of the Amended Complaint in the total amount of $275,000, plus post-judgment interest. [D.E. 133].  We also formally

entered judgment against Fragoso-Diaz on the remaining counts of the Amended Complaint pursuant to the Court's pretrial order of dismissal [D.E. 80] and summary judgment order [D.E. 90]. The Court reserved the issue of attorneys' fees for post-trial adjudication.

Following the entry of judgment, Defendant Officers filed a Rule 50(b) motion on the issue of qualified immunity and a Rule 59 motion for remittitur claiming an excessive damage award. CMB filed a Rule 50(b) motion and a Rule 59 motion for remittitur, raising identical arguments. Defendant Officers and CMB jointly filed a Rule 59 motion for a new trial based largely on the conduct of Plaintiffs' counsel during trial. We first address the Rule 50 motions for judgment as a matter of law.

## II.   ANALYSIS - RULE 50(b)

### A.   *Standard of Review*

Fed. R. Civ. P. 50 is the mechanism for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the case:

> (a)(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)." *Chaney v. City of Orlando,* 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting 9A C. Wright and A. Miller, *Federal Prac. & Procedure* § 2537 (2d ed. 1995));

*see also Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1210 (11th Cir. 2006). Further, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based on the same grounds as the original request for judgment as a matter of law prior to the case being submitted to the jury." *Chaney,* 483 F.3d at 1227 (quoting *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004)).

Thus, under both Rule 50(a) and 50(b), a moving party must meet a heavy burden in order to prevail on a motion for judgment as a matter of law. The standard of review for a district court to grant the motion is whether, "when the facts and inferences are viewed in the light most favorable to the opposing party, they 'point so strongly and overwhelmingly in favor of one party the Court believes that reasonable men could not arrive at a contrary verdict.'" *United States v. Vahlco Corp.,* 720 F.2d 885, 889 (11th Cir. 1983) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969)). The court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." *Telecom Tech. Servs., Inc. v. Rolm Co.,* 388 F.3d 820, 830 (11th Cir. 2004); *see also Robbins v. Koger Props., Inc.,* 116 F. 3d 1441 (11th Cir. 1997) ("A mere scintilla of evidence is not sufficient to support a jury verdict.").

While the court must afford due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation. *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1245-46 (M.D. Fla. 2007). Rule 50 allows the trial court to remove issues from the jury's consideration "when the facts are sufficiently clear that the law requires a particular

result." *Id.* (citations omitted).  Accordingly, if Fragoso-Diaz did not provide a legally sufficient evidentiary basis for a reasonable jury to find in his favor on his claims, we must grant Defendants' Rule 50(b) motions for judgment as a matter of law.  *See also Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1278 (11th Cir. 2005) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004)).

On the other hand, we must deny Defendants' motions for judgment as a matter of law if the plaintiff presented "enough evidence to create a substantial conflict in the evidence on an essential element" of his claims.  *Pickett*, 420 F.3d at 1278 (citing *Bogle v. Orange County Board of County Comm'rs,* 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.")).  To that end, we note that it is not the function of the Court to make credibility or factual determinations under the guise of Rule 50 review.  *See, e.g., Jackson v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276, 1281 (11th Cir. 2005).  If there are conflicting inferences that can be drawn from that evidence, it is not the Court's role to pick the better one.  Instead, all reasonable inferences from the evidence must be drawn in Fragoso-Diaz's favor.  *Id.; see also Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1325 (11th Cir. 1982) (quoting *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 696, 82 S. Ct. 1404, 1409, 8 L. Ed. 2d 777 (1962) ("we are bound 'to give the [plaintiff] the benefit of all inferences which the evidence fairly supports even though contrary inferences might be reasonably drawn'")).

Similarly, if we disagree with the jury's assessment of damages, a federal court has no general authority to reduce the amount of a jury's verdict. *Kennon v. Gilmer*, 131 U.S. 22, 29, 9 S. Ct. 696, 33 L. Ed. 110 (1889).  The Seventh Amendment prohibits re-examination of a jury's determination of the *facts*, which includes its assessment of the extent of the plaintiff's injuries. *Id.* at 30 ("[A federal court may not] according to its own estimate of the amount of damages which the plaintiff ought to have recovered, . . . enter an absolute judgment for any other sum than that assessed by the jury."). To do so would deprive the parties of their Seventh Amendment right to a jury trial. *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1329 (11th Cir. 1999).[4]

If *legal* error is detected, however, the court has the obligation and the power to correct the error by vacating or reversing the jury's verdict. *Id.*  Where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount. *Johansen,* 170 F.3d at 1330 (citing *New York, L.E. & W.R. Co. v. Estill*, 147 U.S. 591, 13 S. Ct. 444, 454, 37 L. Ed. 292 (1883) (modifying a judgment when the jury improperly awarded interest)).  If a reduction in damages is necessitated by legal error, the reduction is not a remittitur and a new trial is not required. *Johansen*, 170 F.3d at 1330 (court may enter judgment reducing punitive damages award to comply with due process guidelines as a matter of law, without plaintiff's consent).

---

[4]     When a court finds that a jury's award of damages is excessive, however, it may grant the defendant a new trial or grant the plaintiff the option of a remittitur of damages.  *See* Fed. R. Civ. P. 59.  *See infra* at Section III.

### B.   *Defendant Officers are Not Entitled to Qualified Immunity*

Defendant Officers claim entitlement to qualified immunity as to Fragoso-Diaz's unlawful arrest claim under § 1983. [D.E. 140 at 3]. Qualified immunity protects law enforcement officials from § 1983 suits for civil damages arising from the discharge of their discretionary functions, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Qualified immunity addresses the concern that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.* For this reason, qualified immunity is a privilege that provides "'an immunity from suit rather than a mere defense to liability.'" *Saucier v. Katz,* 533 U.S. 194, 200-01, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985)). Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

In making a qualified immunity determination, we are obliged to review the facts in the light most favorable to the plaintiff. *E.g., Skop v. City of Atlanta,* 485 F.3d 1130, 1136 (11th Cir. 2007) (citation omitted). An official asserting the affirmative defense of qualified immunity "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro,*

284 F.3d 1188, 1194 (11th Cir. 2002).  There is no dispute that Defendant Officers were performing their discretionary functions as police officers at the time they arrested Fragoso-Diaz.  Thus, the burden shifts to Plaintiffs to show that qualified immunity is not appropriate. *Id.* (citing *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

Qualified immunity is a two-part inquiry.  *Davis v. Williams*, 451 F.3d 759, 762 (11th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. at 201).  First, "in a light most favorable to the part asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.*  Second, if a constitutional right would have been violated under the plaintiff's version of the facts, was that right clearly established? *Id.* (citing *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004) ("[We must determine] whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law")).

### 1. *Fragoso-Diaz's Constitutional Rights Were Violated*

The first step in our qualified immunity analysis is to determine whether the record supports Fragoso-Diaz's contention that Defendant Officers violated his constitutional rights in arresting him.  Individuals have a Fourth Amendment right to be free from "unreasonable searches and seizures."  An arrest is a seizure of the person, and the reasonableness of an arrest is determined by the presence or absence of probable cause for the arrest. *Skop*, 485 F.3d at 1137 (citations omitted).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances

within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search [and seizure] under the Fourth Amendment." *Durruthy v. Pastor,* 351 F.3d 1080, 1087 (11th Cir. 2003) (citing *Redd v. City of Enterprise,* 140 F.3d 1378, 1382 (11th Cir. 1998)). But "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L.Ed.2d 549 (2001).

In the context of a claim for false arrest, "arguable probable cause," *not* the higher standard of actual probable cause, governs the qualified immunity inquiry. *E.g., Knight v. Jacobson*, 300 F.3d 1272, 1274 (11th Cir. 2002). Arguable probable cause is where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" the plaintiff. *Williams,* 451 F.3d at 762 (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). This lesser standard recognizes that, while an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity. "We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." *Skop,* 485 F.3d at 1137 (citing *Anderson,* 483 U.S. at 641 ("it is inevitable that law enforcement officials will

in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable."). To determine whether arguable probable exists, courts must thus look to the totality of all the circumstances. *Williams*, 451 F.3d at 763.

At trial, Defendant Officers testified that there were two possible crimes for which Fragoso-Diaz could have been arrested: disorderly intoxication pursuant to Florida Statute § 856.011 and resisting an officer without violence pursuant to Florida Statute § 843.02. If Defendant Officers possessed probable cause or arguable probable cause to arrest Fragoso-Diaz for either, they are entitled to qualified immunity. We will address each charge in turn.

### (a)  *Disorderly Intoxication*

Section 856.011 provides that:

> No person in the state shall be intoxicated and endanger the safety of another person or property, and no person in the state shall be intoxicated or drink any alcoholic beverage in a public place or in or upon any public conveyance and cause a public disturbance.

Defendant Officers testified that they smelled an odor of alcohol on Fragoso-Diaz when he opened the door of his apartment and confronted them. They could not immediately tell if he was intoxicated, but after he would not calm down and made threatening gestures with his arms, they arrested him. They had also heard yelling from inside the apartment as they approached.

Frankly, from the officers' testimony it is difficult to find that arguable probable cause existed to charge Fragoso-Diaz with disorderly intoxication.[5]   It is well established in Florida that, under this statute, a person may only be charged with disorderly intoxication if the person is both intoxicated *and* at the same time endangering the public safety.  *See, e.g., State v. Holden,* 299 So. 2d 8 (Fla. 1974); *Jernigan v. State,* 566 So.2d 39 (Fla. 1st DCA 1990); *Blake v. State,* 433 So.2d 611 (Fla. 1st DCA 1983).   Florida law does not make public intoxication unlawful; only disorderly intoxication that endangers the public is unlawful under the statute. *Dazell v. Chertoff,* 2005 WL 2581017, *3 n.6 (M.D. Fla. Oct. 13, 2005).

Thus, for instance, someone who is observed staggering and acting unsteadily on a public road is not committing the offense of disorderly intoxication, even if that person is clearly intoxicated.  *See, e.g., Papalas v. State,* 645 So. 2d 153, 155 (Fla. 1st DCA 1994).  Someone in a public place who smells of alcohol, who is flapping his arms around, talking loudly with profanity, and causing "a little disturbance" is still not engaging in disorderly intoxication.  *See Blake,* 433 So. 2d at 612.

From this it appears that, even under the officers' version of the events, it is hard to see how one can charge a person with disorderly intoxication, where the officers did not testify that any member of the public was observed in the area, where Fragoso-Diaz is standing in his own doorway, and where the only tangible conduct that he was committing was waving his arms in a threatening manner.

---

[5]     The State attorney ultimately agreed as all charges were eventually nolle prossed against Fragoso-Diaz.

Nevertheless, perhaps one could still find that these facts, in the light most favorable to the officers' case, gave rise to *arguable* probable cause. But one could definitely not reach that conclusion when forced to consider the facts in the light most favorable to Fragoso-Diaz. The jury clearly credited his testimony that he had at most two or three beers that evening, that he was inside his apartment not playing any music or partying, that he simply objected to the officers' presence because his neighbor was over-reacting to the situation, that he complied with their directions to sit on the couch, and that he was arrested while on the couch only because the Defendant Officers reacted to the conduct of his girlfriend. Under this version of the events, which we must credit on a Rule 50(b) motion, it is simply impossible to find that arguable probable cause existed for the officers to charge Fragoso-Diaz with disorderly intoxication. He was not intoxicated and was not endangering the public safety. He was not in a public place at all; he was inside his apartment. Thus, even a lesser showing of arguable probable cause cannot be satisfied here based on these given facts. There is more than sufficient evidence in this record to sustain the jury's verdict in Fragoso-Diaz's favor on the unlawful arrest claim.

### *(b)   Resisting / Obstruction of Justice*

For similar reasons, we cannot upset the jury's verdict on the more difficult obstruction charge under section 843.02. We must begin with what Florida law defines to be probable cause for obstruction. The relevant statute provides:

> Whoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree. . . .

Fla. Stat. § 843.02.  Probable cause for an arrest under section 843.02 requires a showing that:  "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the action by the defendant constituted obstruction or resistance of that lawful duty."  *Williams*, 451 F.3d at 764 (quoting *Slydell v. State*, 792 So.2d 667, 671 (Fla. 4th DCA 2001)).

The first prong of the test under Florida law is not in dispute.  Fragoso-Diaz's version of the events that morning acknowledged that the officers were purportedly investigating a neighbor's complaint that ultimately led them to arrest him.  They were thus engaged in the execution of a legal duty.

Because this first prong is not in dispute, we need only focus on the second aspect of an obstruction of justice charge:  whether Fragoso-Diaz "obstructed" or "resisted" Defendant Officers as they were executing their legal duty.  The record, drawing all reasonable inferences in Fragoso-Diaz's favor, shows that Fragoso-Diaz did not try and stop the officers from entering his apartment, asked them to leave but did not somehow try to force them to leave, complied with the officers' command to sit on the couch as they looked around the apartment, and said nothing threatening to the officers.  He only protested why they inside his apartment and why they would not wait outside for his girlfriend to finish showering.  The record supporting his case in chief also shows that the officers arrested him only after they responded to what Ruizdelatorre was doing and saying.  According to him, Fragoso-Diaz did nothing to obstruct or impede their investigation, beyond demanding that they leave the

apartment, prior to his arrest.  The record also shows that when the officers said "that's it" in response to Ruizdelatorre's actions, they proceeded to arrest Fragoso-Diaz.

Assuming these facts to be true for Rule 50 purposes, the Defendant Officers still take the position that Fragoso-Diaz interfered with the officers' attempt to investigate a domestic violence call.  They argue that, even though he testified that he was told that the officers were investigating a domestic violence call, he still "told the officers to 'get out' of the apartment, and repeatedly encouraged them to leave." [D.E. 140 at 12].[6]

This argument flies in the face of well established Florida law.  Under Florida law, physical acts or conduct must accompany verbal protests or offensive words to support a conviction under section 843.02.  *See Wilkerson v. State,* 556 So. 2d 453, 455-56 (Fla. 1st DCA 1990) ("We have no doubt that the use of 'oppose' in conjunction with 'obstruct' manifests a clear and unambiguous intent to proscribe only acts or conduct that operate to physically oppose an officer in the performance of lawful duties."); *compare Francis v. State*, 736 So. 2d 97, 99 (Fla. 1st DCA 1999) (physically blocking an

---

[6]     Defendant Officers also take much time to explain that no improper search occurred in this case when the officers entered the apartment, without Fragoso-Diaz's consent, to investigate the domestic disturbance 911 call their department received.  They rely on the "emergency" exception to the warrant requirement under the Fourth Amendment.  We need not reach that issue, however, because Fragoso-Diaz's complaint did not raise an unlawful search claim under the Fourth Amendment.  The complaint only raises an unlawful arrest and excessive force § 1983 claim.  Thus, although the entry into the apartment is certainly relevant to whether or not an unlawful arrest took place once they entered the apartment, we will assume for now that Defendants are right that they could enter the apartment to investigate the call.  We point out, of course, that this argument ignores the officers' version of the events, because they claim they never entered into the apartment.  Defendants' point responds to Fragoso-Diaz's version of the events that occurred that morning.

officer's path to investigate a beating in another room constituted obstruction of justice), *with State v. Dennis*, 684 So. 2d 848, 849 (Fla. 3d DCA 1996) (holding that police did not have probable cause to arrest defendant for obstruction when defendant yelled street term "ninety nine" to alert drug dealer to the presence of undercover officers); *D.G. v. State*, 661 So. 2d 75,76 (Fla. 2d DCA 1995) (verbal protests and refusal to answer officer's questions, unaccompanied by physical opposition or threats, did not constitute obstruction); *J.G.D. v. State*, 724 So. 2d 711, 711-12 (Fla. 3d DCA 1999) (no probable cause to arrest for obstruction despite police order directing defendant to leave an apartment complex, despite his "loud and profane" protests, and despite the gathering of an "unruly crowd").

Based on these Florida precedents, the Eleventh Circuit concluded in *Davis v. Williams* that an objective officer does not have arguable probable cause to arrest a suspect for obstruction without some physical act that interferes with or obstructs the officer's actions. 451 F.3d at 765-66. Merely yelling, verbally protesting, insulting, or disrespecting officers are not enough, without some physical obstruction, to constitute a criminal offense. *Id.* at 766-67.

Contrary to the resolution of this issue with respect to Plaintiff Ruizdelatorre, which presents a very close question, we conclude here that this record, in the light most favorable to Fragoso-Diaz, clearly requires that the Rule 50 motion be denied. The jury accepted Fragoso-Diaz's version of how and why he was arrested. Based on that testimony, the jury's finding that no arguable probable cause existed is fully supportable. The only "obstruction" that they were presented with was his request or

demand that the officers leave his apartment.  Even if we credit the officers' testimony that he was agitated when he did so, the record contains no evidence that Fragoso-Diaz committed a physical act that at all impeded, obstructed or distracted the officers from conducting their investigation.  According to Fragoso-Diaz, after they commanded him to sit down on the couch, he complied.  The officers then looked throughout the apartment for any evidence of domestic violence.  Arguably, the only evidence of obstruction or resistence in the apartment was related to *Ruizdelatorre's* conduct in response to the officers' presence.  The officers, however, arrested Fragoso-Diaz when they became upset at Ruizdelatorre's conduct.  These facts cannot possibly constitute arguable probable cause to arrest Fragoso-Diaz for resistance / obstruction.  *See, e.g., Skop*, 485 F.3d at 1139 (holding that where an individual "simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction.").

The Eleventh Circuit's conclusion in *Davis v. Williams* was based on its examination of Florida law that led it to find that no arguable probable cause existed in that case to sustain an arrest for obstruction absent physical acts or conduct.  451 F.3d at 765-66.  "Neither an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct."  *Id.* at 767. The plaintiff in that case took no physical action that could be deemed to interfere with or impede an officer's investigation.  The suspect did not get physically close to the

officers who were investigating a scene, never made physical threats or use threatening gestures to the officers, and was merely talking loudly or yelling at the officers.

By that measure, the facts in this case, in the light most favorable to Fragoso-Diaz, similarly cannot give rise to any charge for obstruction.  Fragoso-Diaz claims he was simply asking the officers to leave the apartment while his girlfriend was showering, denied engaging in any disturbance or physically touching or impeding the officers, and instead complied with their directions.  *Davis v. Williams* and the Florida cases it relied upon preclude us from upsetting the jury's verdict that credited Fragoso-Diaz's version of the facts.  There is substantial competent evidence in the record that supports the jury's conclusion that the officers did not have arguable probable cause to arrest Fragoso-Diaz.

We are also persuaded by examining one Florida case in particular, cited in *Davis,* that illustrates the point, *Wilkerson v. State*, 556 So. 2d at 453.  That case involved officers at an arrest scene where they had drug dealers and customers on the ground to be searched for weapons.  The defendant emerged from a crowd of people that had formed across the street and began yelling and cursing at the officers.  *Id.* at 454.  She then refused to leave the area after an officer told her to leave, at least two times, because she was interfering with their efforts to make the arrests.  *Id.* Ultimately she was arrested for obstruction under section 843.02.  The court in *Wilkerson* found that the defendant "was not arrested for merely yelling at the officers. She was arrested only after she refused to leave the area where the officers were attempting to make arrests and determine that no weapons were on the persons being

searched, *and because the officer considered her physical presence was obstructing or impeding him.*" *Id.* at 456 (emphasis added).  This finding was critical to what the Eleventh Circuit panel in *Davis* deemed to be a dispositive difference between the facts in their case, which did not involve a defendant physically maintaining a presence close to the arresting officers for purposes of impeding or distracting them, from the facts found in *Wilkerson* where the "court ruled that her presence *did* amount to a physical obstruction of the officer's ability to perform his job." *Davis,* 451 F.3d at 765 (emphasis in original).  *See also H.A.P. v. State,* 834 So. 2d 237  (Fla. 3d DCA 2002) (arguable probable cause to arrest for obstruction was found to exist when a defendant's cursing and shouting was coupled with physical persistence at an arrest scene that became a physical distraction to the officers), *cited in Davis,* 451 F.3d at 765.

Again, if we look at this record in the light most favorable to the Defendant Officers, perhaps we would reach a different conclusion.  The officers claim that Fragoso-Diaz was extremely agitated and physically impeded their ability to investigate the domestic disturbance call by using threatening gestures with his arms.  And when the officers tried to arrest him to control him, he resisted.  Arguably, this version of what happened that morning could lead an objective officer to believe that his investigation was being impeded by Fragoso-Diaz's *physical* actions that occurred when he opened the door.

But we are not at liberty to view the record in this light under Rule 50.  Ultimately this case boiled down to which version of the events the jury believed.  The Plaintiffs testified and the Defendant Officers testified.  Their testimony, at least with

respect to Fragoso-Diaz's arrest, was irreconcilable.  The jury clearly credited the Plaintiffs' version and discounted the officers' testimony.  Fragoso-Diaz presented "enough evidence to create a substantial conflict in the evidence on an essential element" of his claim.  *Pickett*, 420 F.3d at 1278.  As a result it is not the function of this Court to make credibility or factual determinations, contrary to the jury's verdict and the Seventh Amendment, under the guise of Rule 50 review.  *See, e.g., Jackson*, 405 F.3d at 1281.  If there are conflicting inferences that can be drawn from this evidence, and there are, then it is not our role to pick the better one.  *Id.*[7]

Hence we cannot find, as a matter of law, that an objective police officer could reasonably find arguable probable cause to arrest Fragoso-Diaz for obstruction under Florida law.  The jury's verdict on this claim cannot be set aside on the Defendants' Rule 50(b) motion.

## 2.  *This Constitutional Violation was Clearly Established*

The second prong of the qualified immunity analysis requires the plaintiff to show that "the law 'must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.'" *Stanley v. City of Dalton, Georgia*, 219 F.3d 1280, 1285 (11th Cir. 2000).  The conduct must have been clearly

---

[7]       We note here, for instance, that the jury may have tended to believe the Plaintiffs' version based on the testimony of their bandmate, Gola, who very credibly testified as to what transpired in the apartment before he left and that he was confronted by the officers when they arrived in a very belligerent and rude manner. It is certainly possible that the jury, too, believed this eyewitness's testimony, which in turn led them to discount the officers' explanation of how they arrested Fragoso-Diaz outside his apartment.  This is, of course, speculation but we point it out to show that the jury had a tangible basis in the record to reach the conclusion that it did.

unlawful in light of pre-existing law. *See Vinyard v. Wilson,* 311 F.3d 1340, 1350 (11th Cir. 2002) ("'[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002)).

There are a number of ways a plaintiff can demonstrate that his right was clearly established. *E.g., Mercado v. City of Orlando,* 407 F.3d 1152, 1158 (11th Cir. 2005). A plaintiff can show "that a materially similar case has already been decided, giving notice to the police."[8] *Id.* It could also be shown "that a broader, clearly established principle should control the novel facts in this situation." *Id.* "Finally, [a plaintiff] could show that this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Id.*

In a false arrest context, this inquiry is straightforward as our binding precedent clearly holds that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. *E.g., Skop*, 485 F.3d at 1143; *Davis,* 451 F.3d at 764 n.8; *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998); *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) ("We find that, at the time Defendants arrested Plaintiff, the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the Fourth Amendment.").

---

[8] In such a case a plaintiff "must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida" of such factually similar circumstances to have put officers on notice their conduct on the date of the arrest amounts to a constitutional violation. *Id.* at 1159.

Defendant Officers contest the "clearly established" prong and rely on *Mercado v. City of Orlando*, 407 F.3d at 1159, and similar factually distinguishable cases where the court analyzed the "clearly established" element in excessive force contexts. Without citation to any false arrest cases, Defendant Officers argue that:

> Plaintiffs cannot identify any court precedent which would have put Defendant Officers on notice that arresting Fragoso-Diaz for his conduct and circumstances inside the apartment, after entering the apartment while investigating a domestic violence dispatch initiated by at least four separate 911 calls, amounted to a constitutional violation (even if it was learned after-the-fact that no domestic violence had occurred).

[D.E. 140 at 15].

Plaintiffs, however, ignore and never distinguish false arrest cases like *Davis* and *Skop* that, at least for purposes of the charges raised in this case, clearly provided the Defendant Officers fair notice that physical acts or conduct were essential components of an obstruction charge. Thus, regardless of the circumstances that led to the officers' initiation of their investigation, whether that was based on a 911 call or otherwise, Florida officers are charged with the knowledge that persons they encounter cannot be charged with obstruction based solely on offensive words or verbal protests, unaccompanied by physical opposition or threats. *Davis,* 451 F.3d at 765.[9]

---

[9]    Indeed, the decision in *Davis* suggests that the clearly established prong, at least for a false arrest case involving obstruction, is so easily satisfied such that the Court's inquiry need only focus on the first prong of the qualified immunity test, i.e. establishing whether arguable probable cause existed. *Id.* at 764 n.8.  On the other hand, very unique circumstances, or the presence of dispositive facts that were not known to the officers, may require a further examination of how well established the law underlying the given charges was at the time of the arrest.  *See, e.g., Durruthy v. Pastor,* 351 F.3d 1080, 1092-93 (11th Cir. 2003).

This case requires a straightforward application of well established Florida law principles that define the offense of obstruction. The officers here had fair warning that their arrest of Fragoso-Diaz lacked arguable probable cause under state law and was consequently unconstitutional under the Fourth Amendment.

In sum, Fragoso-Diaz met his burden of showing that Defendant Officers are not entitled to qualified immunity. Viewing the evidence in a light most favorable to Fragoso-Diaz, Defendant Officers violated his clearly established Fourth Amendment rights when they arrested him without probable cause. *Davis,* 451 F.3d at 762; *Saucier*, 533 U.S. at 201.

### C.      *Officer Castillo is not Separately Entitled to Judgment*

Defendant Officer Castillo makes a brief argument that he is separately entitled to judgment as a matter of law on the false arrest case because Fragoso-Diaz's testimony primarily identified Officer Ferbeyre as the officer that arrested him, not Officer Castillo. That argument is without merit.

First, Officer Castillo never raised that point at the Rule 50(a) stage of the case. He did raise a similar argument with respect to the excessive force claim, which the Court agreed with and adopted to dismiss the excessive force claim as against him. But the absence of that argument with respect to the false arrest claim requires that the Court deem the argument waived for Rule 50(b) purposes.[10] *See, e.g., Chaney,* 483 F.2d at 1227; *Doe,* 394 F.3d at 903.

---

[10]      We note as well, to illustrate the point, that Officer Castillo never objected to the jury instructions or verdict form that identified him as a defendant to the false arrest claim. That process allowed him to also raise the argument he is raising now, but he never did.

Second, ignoring the waiver of the issue, the argument is meritless because the jury was presented with sufficient evidence that Castillo actively participated in Fragoso-Diaz's arrest and agreed with it at the time that the arrest was made. Indeed, Officer Castillo testified Ferbeyre and he arrested Fragoso-Diaz at the doorway. The fact that Fragoso-Diaz pointed the finger at Ferbeyre as the decisionmaker, who arrested him inside the apartment when he pulled him up from the couch, does not absolve Officer Castillo of liability given the officer's testimony that he participated in the decision to make the arrest. The record thus support's the jury's finding of liability against Officer Castillo as well.

### D.  *CMB's Motion for Judgment as a Matter of Law*

CMB for its part moved for judgment as a matter of law on Fragoso-Diaz's state law claims for false arrest and battery. We denied the motion and permitted the false arrest and battery claims to be submitted to the jury. Ultimately, the jury found from the greater weight of the evidence in Fragoso-Diaz's favor on both state law claims. *See Verdict Form* [D.E. 132 at 1].

CMB here renews its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), and first argues that Defendant Officers had probable cause to arrest Fragoso-Diaz for resisting an officer without violence or disorderly intoxication. CMB's motion mirrors the Rule 50(b) motion filed by Defendant Officers on the federal claim. For the reasons discussed above, Fragoso-Diaz provided a legally sufficient evidentiary basis for a reasonable jury to find that the Officers did not have arguable probable cause to arrest him. Thus, we deny CMB's motion for judgment as well on the state

law false arrest claim.  *See Pickett,* 420 F.3d at 1278; *Rankin v. Evans,* 133 F.3d 1425, 1433-34 (11th Cir. 1998) ('This Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law. . . ." (quoting *United States v. Ullrich,* 580 F.2d 765, 769 (5th Cir. 1978) and *State v. Outten,* 206 So. 2d 392, 397 (Fla. 1968))).

    CMB then argues, with respect to the jury's verdict on the state law battery claim, that it could only be based upon the alleged conduct of CMB's employee, Ferbeyre, under a theory of respondeat superior.  Therefore, if Ferbeyre did not commit an underlying battery against Fragoso-Diaz, the City would be entitled to judgment in its favor as to the battery claim as a matter of law.  Fragoso-Diaz's response in opposition to CMB's motion [D.E. 165] never disputed this argument or even mentioned it.  We too agree that CMB's motion with respect to the battery claim is well taken.

    A battery under Florida law is an intentional infliction of harmful or offensive contact on the person of another. In order to find CMB liable for battery, Fragoso-Diaz had to establish by the greater weight of the evidence: (1) Ferbeyre intended to touch Fragoso-Diaz's person; (2) Ferbeyre actually touched Fragoso-Diaz; (3) the contact was harmful or offensive; and (4) the contact directly or indirectly caused an injury to Fragoso-Diaz.  *E.g., Austin v. U-Tote-M of Broward,* 241 So. 2d 186 (Fla. 4th DCA 1970).  In addition to these elements, special consideration must be given to the fact Ferbeyre was acting under color of state law as a police officer at the time of the alleged battery, such that CMB could only be held liable for a battery committed by Ferbeyre that was not committed in bad faith or with malicious purpose or in a manner

exhibiting wanton and willful disregard of human rights, safety, or property.  Indeed a "presumption of good faith attaches to an officer's use of force in making a lawful arrest." *City of Miami v. Sanders,* 672 So. 2d 46, 47 (Fla. 3d DCA 1996).  A cause of action for excessive force will lie only where the "force used is clearly excessive." *Id.* (citing *Jennings v. City of Winter Park,* 250 So. 2d 900 (Fla. 4th DCA 1971)).  Additionally, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Sanders,* 672 So. 2d at 47.

Here, the testimony and evidence at trial was insufficient, as a matter of law, to overcome the presumption of good faith attached to Ferbeyre's use of force in making a lawful arrest.  The record in this case demonstrates the force used by Ferbeyre during the effectuation of Fragoso-Diaz's arrest was generally reasonable under the circumstances.[11]  The Eleventh Circuit has, on numerous occasions, addressed claims

_____

[11]     The allegations of force allegedly used upon Fragoso-Diaz presented at trial were as follows:

> Q.     Did Febeyre ever hit you?
> A.     Yes, sure he did.
> Q.     When
> A.     When he arrested me he grabbed my hands and bent then and put the handcuffs on me and grabbed my hair.
>
> [D.E. 168 (Fragoso 4/2/08 at 45, lines 5-10)]
>
> Q.     Did Febeyre hit you while you were still in the apartment?
> A.     No. He got me out of the apartment and on the way he would push and kick me.
> Q.     Where did he kick you? What part of your body?
> A.     On my behind to push and kick me so I would move forwards.
>
> [*Id.* at 45, lines 19-25; 46, line 1)]
>
> Q.     Did he inflict, did you feel any pain with the strikes that Ferbeyre

of excessive force by police officers, and has repeatedly held that grabbing a suspect, throwing a suspect against the police car to secure an arrest, attacking a suspect and/or using force to subdue a suspect, is not enough to inevitably lead to the conclusion the force was unlawful. *See, e.g., Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir. 2000) (grabbing a suspect from behind by the shoulder and wrist, throwing him against a van a few feet away, kneeing him in the back, pushing his head in the side of the van, and searching his groin area in an uncomfortable manner were objectively reasonable steps to take during an arrest); *Gold v. City of Miami,* 121 F.3d 1442, 1444 (11th Cir. 1997) (handcuffing too tightly and too long was not excessive force); *Jones v. City of Dothan,* 121 F.3d 1456, 1458 (11th Cir. 1997) (slamming plaintiff against the wall, kicking his legs apart and requiring plaintiff to raise hands above head was not an example of excessive force); *Post,* 7 F.3d at 1556 (pushing plaintiff against wall while handcuffed was not excessive force), *as modified,* 14 F.3d 583 (11th Cir. 1994).

Fragoso-Diaz introduced no evidence of any medical bills, hospitalization or medical care.  Further, a number of the pictures introduced at trial allegedly depicting his injuries contained no extensive visual evidence of bruising.  The description of the force used by Ferbeyre by itself does not rise to the level necessary to impose liability against CMB.

---

                              inflicted upon you?

A.     My hair, my head, my hands.

Q.     From the handcuffs or from the strikes?

A.     Because of the handcuffs and because of the way that he would hold me by the handcuffs and by my hair and he was pulling me and he was hurting me.

[*Id.* 46, lines 2-10]

Moreover, the jury's verdict in favor of Fragoso-Diaz on the battery claim is at odds with the jury's verdict in the Defendant Officers' favor on the excessive force claim under § 1983. The jury's verdict expressly found that Officer Ferbeyre *did not* use excessive force against Fragoso-Diaz even though they believed Fragoso-Diaz had been falsely arrested. If the jury believed the use of force was appropriate during what they deemed to be an unlawful arrest, the testimony at trial did not establish that the amount of force used by Ferbeyre was excessive or unreasonable to independently support a state law battery claim. Yet the jury's verdict inconsistently found to the contrary on that claim. CMB, therefore, is clearly entitled to judgment as a matter of law on the state law battery claim.[12]

### III.   ANALYSIS - RULE 59

Defendant Officers and CMB jointly filed a Motion for New Trial pursuant to Fed. R. Civ. P. 59. [D.E. 149]. The motion raises three distinct grounds for a new trial: (i) Plaintiffs violated the pre-trial stipulation by injecting race into the trial; (ii) Plaintiffs' closing argument was overly prejudicial; and (iii) the verdict is against the great weight of the evidence. The parties also independently filed motions for

---

[12]    Perhaps the jury's inconsistent verdict stemmed from what they perceived as a battery committed upon Fragoso-Diaz at the jail by an unknown Officer "Smith." The Court, however, dismissed that claim against that officer prior to trial, and the Court did not permit an independent battery claim to proceed against the City based on that conduct, where it had never been pled in the complaint or preserved as an issue for trial in the pretrial stipulation. [D.E. 81]. Evidence of that encounter was allowed to be introduced solely to support Fragoso-Diaz's case for compensatory damages foreseeably flowing from the false arrest itself. The jury was charged on the battery claim for only the conduct of Officer Ferbeyre that occurred during the arrest. [D.E. 129 at 12 (Jury Instr. No. 8)]. Thus, to the extent that the jailhouse conduct of this officer led to the jury's verdict on the battery claim, the jury's verdict lacks evidentiary and legal foundation.

remittitur. [D.E. 147, 148].  Defendant Officers argue for remittitur and maintain that the verdict is both excessive, and disproportionate compared to jury awards in similar false arrest cases. [D.E. 147].  CMB moves for remittitur on these same grounds, but also insists that the damage award should be reduced pursuant to Florida's sovereign immunity statute, Fla. Stat. § 768.28(5). [D.E. 148].  For the reasons addressed in more detail below, Defendants' motion for a new trial on liability should be denied but a new trial or remittitur order should be granted based on the excessive damage award.

### A.    *Standard of Review*

Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, a court may grant a new jury trial "'for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  A party may seek a new trial by arguing that "the verdict is against the great weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940); *Steger v. General Elec.* Co., 318 F.3d 1066, 1081 (11th Cir. 2003).  However, a motion brought pursuant to Rule 59 may not "relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  *Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (motion to amend or alter judgment was essentially a motion to reconsider the district court's prior summary judgment order).

Resolution of a motion for a new trial is committed to the discretion of the trial court.  *See Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999).  When ruling on a motion for a new trial, the judge must determine "if in his opinion, 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'"  *Insurance Co. of N. America v. Valente*, 933 F.2d 921, 922-23 (11th Cir. 1991) (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984)).  "[T]o assure that the judge does not simply substitute his judgment for that of the jury, . . . we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence."  *Id.* at 923 (quoting *Hewitt,* 732 F.2d at 1554).  The judge must protect against manifest injustice in the jury's verdict, but it is not her role to assess credibility where conflicting testimony has been presented during the trial.  *Id.* at 1558-59. Instead, the judge must defer to the jury on the weight to be given to each witness's testimony.  *Id.*

Finally, when a court finds that a jury's award of damages is excessive it may grant the defendant a new trial.  *E.g., Johansen,* 170 F.3d at 1329 (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433, 116 S. Ct. 2211 (1996)); Fed. R. Civ. P. 59.  Alternatively the court can enter a remittitur order and reduce the damages to the highest allowable amount under the law, which the plaintiff can accept or instead seek a new trial on damages. *See, e.g., Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d 1304, 1310 (11th Cir. 1990); *Wilson v. Taylor,* 733 F.2d 1539, 1549–50 (11th Cir. 1984),

*overruled on other grounds, Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989). Pursuant to the Seventh Amendment, a plaintiff must be given that option of a new trial in lieu of remitting a portion of the jury's award.  *See* U.S. Const. amend. VII; *Johansen,* 170 F.3d at 1329 ("[N]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact.").  Finally, the decision whether to grant a new trial or remittitur on the grounds of excessive damages is also a matter within the sound discretion of the district court.  *E.g., Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241, 1249 (11th Cir. 2001); *Simon,* 895 F.2d at 1310.

### B.   *Plaintiffs Did Not Improperly Inject Race into the Trial*

First, Defendants request a new trial on the basis that Plaintiffs impermissibly tainted the jury by suggesting that Fragoso-Diaz's arrest was racially motivated. "[W]here the interest of substantial justice is at stake, improper argument may be the basis for a new trial . . . ." *Christopher v. Florida*, 449 F.3d 1360, 1367 (11th Cir. 2006) (citing *McWhorter v. Birmingham*, 906 F.2d 674, 677 (11th Cir. 1994)).  Defendants surmise that Plaintiffs and Plaintiffs' counsel directly violated the pre-trial stipulation by "injecting race" into the trial.

Before the jury was selected, the parties stipulated that no evidence concerning racial motivation would be introduced at trial. [D.E. 149 at 6].  Defendant Officers point to the following colloquy that occurred during Fragoso-Diaz's direct examination as evidence that Fragoso-Diaz violated the pre-trial stipulation:

Q.    Did Ferbeyre say anything while he was putting the cuffs on?

A.    He was like, that's it, he said, that's it.  You know, I don't really remember exactly what he said but I know that he was talking.

[ ... ]

Q.    Did you hear him announce at any point -

A.    I almost said that but I really don't remember what he said, and I know he did not say that.  I know he was insulting Michelle.

[ ... ]

Q.    When did you hear that insult?

A.    When he was arresting him, he was insulting him. I even think he said the – word, but I'm not going to say that I know for sure.

Papy.  Your honor.

A.    I know you [Defense counsel] said you did not want to make it a race case.

Papy.  I move for sidebar.

Court.  Overruled. The answer will be stricken, ignore her answer.  Ask the next question.

[D.E. 149 at 7].

Defendant Officers suggest that Plaintiffs' counsel compounded the problem by arguing in closing argument that "[t]hey won't be in prison for speaking out against the government, like they are in Cuba and they won't have police officers go into their houses in the middle of the night just because they don't like what they look like to just because they are who knows what." [D.E. 149 at 9].  Based on this conduct, Defendants feel that the "only appropriate remedy would be an order granting a new trial." *Id*.  We disagree.

As to the conduct of Ruizdelatorre when she testified, her statement, albeit improper, was brief.  Even if the statement was a flat out lie, made intentionally to inflame the jury, Defendants had ample opportunity to cross-examine her and challenge the veracity of her statement.  Had this testimony been as damaging as Defendants suggest, presumably Defendants would have spent a significant amount of cross-examination on the issue, but they did not do so.  Instead, Defendants objected to the testimony, the Court sustained the objection along with a curative instruction, and the case went forward.  No further remedy is warranted.

The record similarly fails to support the accusation that Plaintiffs' counsel intentionally violated the pretrial stipulation.  There was nothing suspicious about the questions asked on his direct examination of Fragoso-Diaz, i.e. there was no attempt to elicit improper testimony.  Moreover, counsel's statements in closing argument did not "inject race" into the trial.  Statements attempting to juxtapose this case with the Cuban prison system, were not so prejudicial such that they could have an effect on the outcome.  Ultimately, the Court finds that each side was able to present its case. Notwithstanding the final verdict, counsel for Plaintiffs and Defendants adequately and forcefully presented arguments to the jury.  The trial was fair in every material respect.

### C.    *Plaintiffs' Closing Argument was not Overly Prejudicial*

Defendants argue that the closing argument of Plaintiffs' counsel was permeated with prejudicial and improper statements of such quality and quantity that we must order a new trial.  Defendants cite to thirteen different supposedly improper

statements in Plaintiffs' closing argument.  Notably, they only objected to one of the statements when it was made during closing argument. [D.E. 149 at 14-17].   In response, Plaintiffs take the position that the closing arguments were not improper, not prejudicial, not objected to, and that any possible prejudice was cured by the Court's instructions. [D.E. 166 at 5-7].

Generally, a timely objection is necessary to bring to the district court's attention error in counsel's arguments. *E.g., Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993).  When no objections are raised, we review the arguments for plain error, but a finding of plain error "is seldom justified in reviewing argument of counsel in a civil case." *Id.* (quoting *Woods v. Burlington Northern R.R. Co.*, 768 F.2d 1287, 1292 (11th Cir. 1985) (per curiam), *rev'd on other grounds*, 480 U.S. 1, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987)).  Only when the interests of substantial justice are at stake should the court order a new trial. *McWhorter*, 906 F.2d at 677 (counsel's reference to excluded evidence in direct contravention of the district court's order constituted prejudicial error).  The philosophy underlying this rule is aptly summarized in *Woods*:

> Requiring timely objection prohibits counsel from "sandbagging" the court by remaining silent and then, if the result is unsatisfactory, claiming error.  Second, there are a number of good reasons why skilled trial counsel may make a tactical decision not to object to improper argument: (1) an argument that looks highly improper in a cold record may strike counsel as being wholly lacking in effect; (2) because of the 'chemistry' of the courtroom counsel may think that the improper argument may offend and in effect backfire; and (3) the improper argument may open the door to a response that will be of more value than a sustained objection.

*Woods*, 768 F.2d at 1292 (citations omitted).

Defendants portion the purportedly improper arguments into five categories: (i) statements for which there was no supporting evidence; (ii) outright misstatements of the evidence calculated to mislead the jury; (iii) expressions of counsel's personal opinions; (iv) references to specific jurors in violation of the "Golden Rule"; and (v) implications that insurance would cover an adverse verdict. [D.E. 149 at 14]. Notwithstanding the litany of improper statements, we find that Defendants are not entitled to a new trial.

Primarily, we reach this decision because Defendants made no attempt to object to these arguments at the time they were made.  Defendants could have raised objections, and these objections would likely have been sustained. But Defendants made the strategic decision to stay silent in the face of objectionable statements made by opposing counsel.  This amounts to a waiver given the type of statements made in this case because, without an objection, the Court had no opportunity to remedy the situation. *See, e.g., Miledy Strait v. Busch Entertainment Corp.*, 2007 WL 496607, *2 (M.D. Fla., Feb. 12, 2007) (citations omitted).

To be fair, counsel's closing argument was riddled with improper statements. For instance, counsel improperly voiced personal opinions: "I spend my whole life every day, enraged.  Enraged about the war in Iraq, enraged about what's happening in China, enraged about what happened just everywhere.  I spend my life being enraged at how people treat each other." [D.E. 149 at 16].  Raising controversial geopolitical issues during closing argument risked alienating the jury, and, if anything, harmed counsel's credibility.  Defendants made a calculated decision *not* to object to this

statement, and frankly, we cannot say that this strategy was unreasonable.   But Defendants cannot now turn back the clock to object to these comments after the fact merely because of the unsatisfactory jury verdict.

We nevertheless reviewed each of the claims in context and have determined that counsel's statements did not warrant a new trial.  *Oxford*, 984 F.2d at 1129. One statement, however, deserves particular attention because Defendants raised a timely objection:

| Norkin: | So ladies and gentlemen I want to remind you please when you're thinking about the damages, because it's not on the verdict form, remember it's for past damage and future damages.  Not just in the past.  Because people have to live with what they went through, being held powerless by people of authority.  They cannot do anything, they can't say anything to them for fear they will get beaten more ... It's like Abu Gharaib when they humiliated those people. |
|---|---|
| Switkes: | Objection. |
| The Court: | Sustained. |
| Norkin: | No, it's just a comparison. |
| The Court: | Sustained. |
| Norkin: | No, I'm just saying – |
| Switkes: | Objection, Your Honor. |
| The Court: | Sustained. |
| Norkin: | Fine. |
| The Court: | Make your last point. |

[D.E. 149 at 14-15].  In this case, a timely objection resulted in immediate relief, and counsel was forced to abandon his irrelevant argument.  We recognize that counsel

comparing Plaintiffs' case or referencing in any way the Abu Ghraib prison scandal was inappropriate, highly inappropriate. Having witnessed the jurors' reactions to this statement first hand, however, we are confident that they afforded it as much credence as it deserved: none.

In the end, based on the thorough and careful exercise of our discretion, we conclude that any improper argument by counsel did not rise to the level of a miscarriage of justice or an unfair trial. The jury weighed the conflicting evidence carefully, believed the Plaintiffs' and their witnesses' testimony, most likely ignored the ramblings of their lawyer, and rendered a verdict that is supported by the evidence presented. The Court instructed the jury to consider only the evidence and that anything the lawyers say is not evidence. And the Court evaluated the jurors' response to Plaintiff's counsel's statements that evidenced that the jurors were not taken off course by any over-the-top statements made in closing argument.

That being said, the jury's award was extremely high given the amount of damage evidenced presented. It is thus also possible that counsel's inappropriate comments inflamed to jury to some extent. The solution to that particular problem can be addressed separately (as discussed below). A new trial on liability, however, based solely on the inappropriate nature of certain statements in the closing argument that were largely not objected to, should not be granted.

### D. *The Jury Award Was Excessive*

Finally, Defendants argue that they are entitled to a new trial, or alternatively, a remittitur of the jury's verdict. The jury awarded Fragoso-Diaz $275,000 against

Defendant Officers and CMB. Defendants argue that the evidence presented at trial was insufficient to support this award.

To remit the § 1983 compensatory damages award in this case, the Court must determine the compensatory damages award "is so high as to shock the judicial conscience and constitute a denial of justice." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2nd Cir. 2003) (citing *Mathie v. Fries*, 21 F.3d 808, 813 (2d Cir. 1997)). "In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as to at least imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like." *Slip-n-Slide Records, Inc. v. TVT Records, LLC*, 2007 WL 3232274 (S.D. Fla. Oct. 31, 2007) (citing *Hipp v. Liberty Nat. Life Ins. Co.,* 65 F. Supp. 2d 1314, 1344 (M.D. Fla. 1999)).

For the state law false arrest claim, Florida law determines whether a jury award is excessive, while federal law governs the procedural question of whether a new trial is warranted if the damages are found to be excessive. *See, e.g., Hattaway v. McMillian,* 903 F.2d 1440, 1450 (11th Cir. 1990). As Florida courts recognize, there is an element of speculation in most tort cases:

> Where recovery is sought for a personal tort, or where punitive damages are allowed, we cannot apply fixed rules to a given set of facts and say that a verdict is for more than would be allowable under a correct computation. In tort cases damages are to be measured by the jury's discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.

*Bould v. Touchette*, 349 So. 2d 1181, 1184-85 (Fla. 1977). A party who assails the amount of a verdict as being excessive has the burden of showing it is unsupported by the evidence, or that the jury was influenced by passion or prejudice. *Id.*

To be sure, damages for emotional distress or mental anguish are always difficult to measure. *Copley v. BAX Global, Inc.*, 97 F. Supp. 2d 1164, 1171 (S.D. Fla. 2000) (citations omitted). The Court has no doubt that Fragoso-Diaz suffered emotional distress as a result of this incident, especially considering that he was forcibly removed from his apartment at 6:00 a.m. in the morning, taken to jail where he was ridiculed and manhandled by one of the jailing officers, where he was left in a jail cell for several hours before his release, and generally subjected to the physical pain and emotional humiliation of having been arrested for something he did not believe was just. That injury, as found by the jury, cannot be minimized simply because it is not readily observable or easily converted to a monetary figure.

Nevertheless, in assessing the appropriateness of an award of compensatory damages, federal courts should look to: (1) the size of the award; (2) the rational relationship between the award and the evidence adduced at trial; and (3) awards in similar cases. *Id.* at 1172. As to the first and second prongs, Fragoso-Diaz did not present evidence as to any medical bills incurred, physical injuries, or lost wages. He did not present any evidence that he has been financially harmed in any way as a result of Defendants' conduct. At best, he presented limited evidence of psychological damages, but did not have an expert psychologist or psychiatrist testify at trial as to any long-term effects of Fragoso-Diaz's arrest. In fact, he admitted that he did not see

a doctor, psychologist, or any other medical professional subsequent to the arrest.  The only damage evidence submitted on Fragoso-Diaz's behalf was his own.

Reasonable people, and thus reasonable juries, could thus certainly differ as to an amount that would compensate Fragoso-Diaz for his physical pain and mental anguish, but $275,000 is beyond the realm of reasonableness.  The Court conducted a wide search of jury verdicts in this district concerning claims for false arrest, and the damage awards were a fraction of the award in this case. *See Sterling Thomas Cowart v. Broward County Sheriff, et al.,* No. 05-cv-60862, 2007 WL 5273724 (S.D. Fla., June 8, 2007) (awarding $15,000 for physical and/or emotion damages in a section 1983 claim for false arrest); *Jones v. Sheriff of Broward County*, No. 92-6913, 1995 WL 684469 (S.D. Fla. Aug. 21, 2995) ($37,000 award for violation of civil rights for unlawful search and seizure and state torts of false arrest; after defendant was acquitted of criminal charges, he was sent back to jail and strip searched, and remained in jail for several hours before his release); *Davis v. Deputy Edward Becht*, No. 03-01519, 2007 WL 4523028 (M.D. Fla., Mar. 8, 2007) ($43,962 verdict for unlawful arrest; $20,000 for physical pain, emotional pain, and mental anguish, the remainder for medical expenses and loss of income); *Migone v. Miami-Dade County*, No. 03-21635, 2006 WL 2382307 (Fla. Cir. Ct. 11th, Feb. 17, 2006) ($50,000 jury award for false arrest; plaintiff was arrested and held in custody for approximately ten hours).

The former Fifth Circuit in *Keyes v. Lagua,* 635 F.2d 330 (5th Cir. 1981), reversed an award of $75,000 in favor of two plaintiffs for false arrest and excessive force under § 1983.  After affirming liability, the appellate court reversed the damage

award because such an award for an unlawful detention that lasted two hours, where no evidence of any medical or psychological injury was presented, any force used resulted in only headaches, numbness, bruising, as well as anxiety and nervousness. "The conduct of the defendants undoubtedly caused Mrs. Keyes pain and suffering, and credible evidence established that she suffered emotional reactions such as heightened anxiety and loss of sleep, but the award appears to us to be beyond the maximum possible recovery for those items-according to the evidence in this record." *Id.* at 336. In today's dollars, the judgment reversed in that case, adjusted for inflation, was $171,000.

In relationship to these cases, a single award for a single plaintiff for $275,000 is simply excessive, when that award is based on a false arrest, leading to physical and mental anguish but without any evidence of long-term injury or tangible harm. As the Court in *Keyes* found, an award of that magnitude is simply outside the maximum possible amount that the law allows. To be fair, of course, the injury here is far greater than the more minimal injury suffered in *Keyes,* which did not result in an incarceration for any period of time. Here, a higher award is clearly supportable under the law for a single plaintiff who suffered great humiliation and suffered physical trauma due to the unlawful actions of the officers.

But as the other cases cited above show, quite similar occurrences resulted in far lesser damage awards than the one at issue in this case. Absent greater evidence of long-term physical or mental injury, a $275,000 award to a single plaintiff is not sustainable. There are, of course, outliers where juries and courts awarded higher

amounts, but these cases are largely factually distinguishable precisely because the plaintiffs in those cases suffered a greater degree of physical injury or long-term emotional harm. *See, e.g., Rivera v. Miami-Dade County, et al.*, No. 03-11431 CA 20, 2006 WL 4468139 (Fla. Cir. Ct. 11th Oct. 4, 2006) (consolidated case where three individuals were falsely arrested on non-bondable offenses; plaintiffs remained in custody for a total of twelve, twenty-two, and thirty-three days, and jury awarded damages of $83,432, $94,800, and $128,910, respectively); *Nguyen, M.D. v. Deputy Kenneth Carlisle, et al.*, No. 04-cv-00026, 2006 WL 4099923 (N.D. Fla., Sept. 21, 2006) (verdict of $1,836,100 for false arrest and malicious prosecution; vast majority of damages stemming for loss of reputation and harm to plaintiff's medical practice).

The Eleventh Circuit recently in fact affirmed a jury's verdict and the denial of a motion for new trial/remittitur for a compensatory award on a false arrest and battery claim of $225,000. *See Edman v. Marano*, 177 Fed. Appx. 884, 2006 WL 1025030 (11th Cir. 2006). We point out, however, that the plaintiff in *Edman* introduced tangible medical evidence that he suffered from post-traumatic stress disorder that he developed as a result of the false arrest. We also note that even with that level of evidence the jury's award in *Edman* was still less than the jury's verdict here, in a case that involved no medical or psychological evidence, nor any evidence of tangible long-term injury beyond numbness in Plaintiffs' wrists.

We add as well that the jury's verdict form (without objection from either party) requested the jury to make a compensatory damage award as a whole, rather than breaking out the jury's award between the false arrest, excessive force, and battery

claims.  In hindsight, that was ill-advised because it makes it more difficult to assess now whether the jury's verdict is outside the realm of reasonableness where it can only be based on the false arrest claim.  The jury ruled against Fragoso-Diaz on the excessive force claim, and the Court has, based in part on that finding, entered judgment against him on the battery claim.

Therefore, we can only say that some portion of the $275,000 was attributable to the state law battery claim that can no longer independently survive given the jury's verdict and the evidence.  The award, therefore, is now a product, at least in part, of a fundamental mistake.  Moreover, we have to also take into account that the jury's award on the false arrest claim may have been inflamed, and thereby influenced by undue passion, from some of the inflammatory statements made by counsel during his closing argument.  The Court must now take that into account as well.  *See Christopher*, 449 F.3d at 1368, n.11 ("We see the jury's award of excessive damages as proof that Plaintiff's counsel's misconduct probably influenced the jury").

In the exercise of our discretion, therefore, we conclude that a new trial on damages is necessary, but an alternative remittitur order is also appropriate.  *See, e.g., Middlebrooks,* 256 F.3d at 1249.  Under the Seventh Amendment, the Court must offer Fragoso-Diaz the choice of a new trial or a remittitur.  *See Johansen,* 170 F.3d at 1329.  Given the nature of this evidence, and based solely on the false arrest claim surviving Rule 50(b) review, we find that an award of $100,000 is the highest possible damage award that the evidence supports.  The Court finds that it must exercise its discretion

in this case and grant Fragoso-Diaz the option of a new trial or remittitur on the basis of an excessive damage award.

Finally, we note that CMB's motion for new trial argues that the Court should remit the award to the highest possible amount recoverable under Florida's sovereign immunity statute, Fla. Stat. § 768.28(5). Given the Court's decision to grant a new trial on damages or a remittitur to an award of $100,000, this portion of CMB's motion is moot.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Defendant Officers Noel Castillo's and Antonio Ferbeyre's Motion for Judgment as a Matter of Law [D.E. 140] is **DENIED.**

2.     Defendant City of Miami Beach's Motion for Judgment as a Matter of Law [D.E. 145] is **GRANTED IN PART AND DENIED IN PART**. The Motion is Denied with respect to the judgment on Count III of the Amended Complaint for false arrest under state law. The Motion is Granted with respect to the judgment on Count IV of the Amended Complaint for battery under state law.

3.     Defendants' Joint Motion for New Trial [D.E. 149] is **GRANTED IN PART AND DENIED IN PART**. Subject to Plaintiff Michelle Fragoso-Diaz's acceptance of the Court's remittitur, the Court will order a remittitur of the total compensatory damage award to $100,000.00 and enter an Amended Judgment accordingly. If the remittitur is not accepted, a new trial shall be held limited to the

determination of the amount of damages that should properly be awarded in this case. Fragoso-Diaz shall file with the Court a statement within ten (10) business days of the date of this Order as to which of these two options he will elect. If Fragoso-Diaz desires additional time to consider the remittitur issue, he may file a motion to that effect, but the Court will not issue an Amended Judgment or modify the Court's pending stay of execution of the judgment until that time. Defendants' Motion is in all other respects Denied.

4.      Defendant Officers Noel Castillo's and Antonio Ferbeyre's Motion for Remittitur [D.E. 147] is **GRANTED** in accordance with ¶ 3 of this Omnibus Order.

5.      Defendant City of Miami Beach's Motion for Remittitur [D.E. 148] is **GRANTED** in accordance with ¶ 3 of this Omnibus Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of December, 2008.

EDWIN G. TORRES
United States Magistrate Judge